[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15808

_____

D. C. Docket No. 05-20355-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SERGE EDOUARD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 11, 2007)**

Before BARKETT, KRAVITCH and STAHL,* Circuit Judges.

KRAVITCH, Circuit Judge:

_____

* Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

Serge Edouard appeals his convictions and sentence for conspiracy to import cocaine, conspiracy to commit money laundering, and money laundering.  He argues, <u>inter alia</u>, that the district court failed to comply with the Court Interpreters Act.  For the reasons that follow, we affirm.

## I.  BACKGROUND

### A.  <u>Offense Conduct and Trial</u>

During Edouard's trial, the Government introduced the testimony of several witnesses, many of whom were admitted co-conspirators testifying in exchange for immunity from prosecution for their roles in Edouard's charged offenses and/or a possible reduction in their sentences.  The evidence established the following:

At Edouard's direction, his brothers, Hughes and Hubert Edouard, began smuggling cocaine from Haiti into the United States from 1995 to 1996 by concealing it in their clothing and their shoes.  Hughes and Hubert also hired others, at Edouard's behest, to smuggle cocaine into the U.S. using this method.  In 1996, Hughes and Hubert began smuggling Edouard's cocaine by hiring couriers to carry the cocaine in suitcases and fly as passengers on commercial airliners from Port-au-Prince, Haiti to New York's John F. Kennedy Airport ("JFK").  Hughes and Hubert purchased cocaine in Haiti with money provided by Edouard, who lived in New York at this time.  The brothers loaded the cocaine into suitcases and

2

gave them to couriers who took the suitcases to the Port-au-Prince airport, where Haitian police officers and airport security workers, paid by Edouard, would ensure that the couriers and the suitcases went through security without difficulty. Once the suitcases arrived at JFK, an airline employee, also paid by Edouard, would surreptitiously retrieve the suitcases and deliver them to Edouard, who would then sell the cocaine for approximately $22,000 to $24,000 per kilogram. Hughes and Hubert each received approximately $10,000 to $15,000 per shipment. According to the brothers, Edouard smuggled one or two suitcases, twice per month, each packed with twenty-one to twenty-three kilograms of cocaine.

In 1997, Edouard and his brothers stopped using suitcases to smuggle cocaine and began using cargo boxes shipped via American Airlines' cargo service. At some point in 1997, Edouard returned to Haiti and asserted greater control over the Haitian end of his operation. Shortly thereafter, Jacques Jean Louis took over the cargo shipments in New York from Hughes and Hubert while Edouard received the proceeds in Haiti.

During 2000, Hughes became re-involved in the airline cargo shipments by collecting the proceeds from the cocaine sales in New York and sending them back to Edouard in Haiti. According to Hughes, he sent approximately $500,000 to $1,000,000 to Edouard three to four times per month via American Airlines

3

employees and other couriers who concealed the money in their carry-on bags. Hughes estimated that from 1997 to 2000, Edouard shipped between 3,000 and 5,000 kilograms of cocaine via cargo boxes smuggled through American Airlines' cargo service.

In May 2000, Edouard encountered Clifford Sibilia during a party in Haiti at the home of drug-trafficker Jacques Ketant. Sibilia had first met Edouard in 1998 while they were both in federal custody in Miami, Florida. During the party, Edouard, Sibilia, and Ketant discussed various methods of smuggling cocaine from Haiti into America. According to Sibilia, the men devised a plan to use a cargo boat to ship poultry products from the United States to Haiti in a shipping container equipped with a secret compartment.

In September 2000, Sibilia returned to Florida to establish "Cool Beverage," the company that would serve as the "legitimate" front for the smuggling operation he, Edouard, and Ketant had discussed in Haiti. After establishing Cool Beverage, Sibilia returned to Haiti where Edouard gave him money to purchase a forty-foot shipping container and the poultry products to be shipped inside the container. After purchasing the container in the U.S., Sibilia brought the container to Haiti. There, Edouard hired workers to construct a twenty-foot-long, secret compartment in the top of the container. Edouard and Ketant purchased twenty-five kilograms

4

of cocaine, which they, along with Sibilia, concealed in the secret compartment. They then placed the container on a cargo boat headed to Port Everglades, Florida.

Using binoculars, Sibilia watched the boat's arrival at the shipyard in Port Everglades and noted that the container had cleared U.S. Customs without any delay. Sibilia had the container delivered to the yard of the poultry supplier, and during the night, he retrieved the cocaine from the secret compartment. Sibilia then sold the cocaine for $500,000, taking $100,000 for himself and shipping $400,000 back to Haiti for Edouard and Ketant via the secret compartment of the now poultry-filled container. Once the container arrived at the shipyard in Haiti, Edouard retrieved the $400,000.

After the success of this initial venture, Sibilia, Edouard, and Ketant shipped 90 to 100 kilograms of cocaine to Port Everglades via this cargo-boat method in October and November 2000. In December 2000, however, U.S. Customs officials discovered the secret compartment during an inspection and seized 100 kilograms of cocaine. Upon noticing that the container took longer than usual to clear Customs and that Customs officials had followed the container to the poultry supplier, Sibilia notified Edouard and abandoned the load.

In November 2000, Sibilia learned that Edouard was also smuggling cocaine from Haiti to New York via commercial airliners. Sibilia testified regarding the

details of this aspect of Edouard's operation based on information he had received from Edouard. Sibilia also claimed that he twice sent cocaine through Edouard using this method and that he was paid by Hughes after the cocaine was sold in New York.

Sometime in late 2000 or early 2001, Edouard ceased using American Airlines' cargo service to smuggle his cocaine, and instead began using the metallic boxes that the airlines use to store suitcases ("airline containers"). The night before a shipment was to leave the Port-au-Prince airport, Romaine Lestin, the chief of airport security, and other Haitian police officers would unlock an airport warehouse so that someone hired by Edouard could gain access to the airline containers. Once inside the warehouse, Edouard's employee would construct a secret compartment in an airline container and fill the compartment with cocaine. The container was then loaded with suitcases and placed onto a flight headed for JFK. In addition to Lestin, Edouard also received help from Oriel Jean, the chief of security for Haiti's then-president, Jean-Bertrand Aristide. Jean testified that he provided Edouard with a palace security badge so that the Haitian police would not search his person or vehicles, thus allowing Edouard to transport cocaine and money to and from the airport without police interference. In exchange for the badge, Jean received a share of the proceeds from Edouard's

6

cocaine sales, either directly from Edouard or from others in Edouard's organization (including Lestin). In total, Edouard smuggled between 10,000 and 12,000 kilograms of cocaine into the U.S. using this method.

In August 2001, Edouard shipped 100 kilograms of cocaine from Haiti to Miami International Airport via three suitcases ticketed to travel to Europe. Once the suitcases arrived in Miami, airport workers, paid by Edouard, changed the tags on the suitcases to ensure that they did not go through Customs and on to Europe. Hughes and Hubert, who had traveled from Haiti, along with Max LaFontan went to the Miami airport to retrieve the suitcases on August 28, 2001. Phone records showed that from August 26th to August 28th, approximately forty phone calls had been made between Hubert's cell phone and Edouard's phone number in Haiti. After retrieving the suitcases, Hubert brought them to his apartment in Doral, Florida and gave twenty kilograms of the cocaine to Richard Scutt. Shortly thereafter, Hubert and Scutt were arrested. Hubert was ultimately convicted of conspiracy to possess and distribute cocaine.

Eddy Aurelien worked in Edouard's drug-trafficking operation as a courier from 1999 to 2003. According to Aurelien, at Edouard's direction, he would pick up suitcases containing cocaine from a hotel in Haiti and deliver them to Edouard two or three times per month, with each delivery containing between thirty and

sixty kilograms of cocaine. In return for Aurelien's services, Edouard would ship three or four kilograms of cocaine for Aurelien to New York, Miami, or Canada, where it would be sold. The proceeds from the sales were shipped back to Haiti on commercial airliners arriving at the Port-au-Prince Airport. Aurelien estimated that he received between $14,000 and $15,000 per kilogram of cocaine sold. Aurelien also testified about the roles Lestin, Jean, and Hughes had played in Edouard's operation.

In addition to his cocaine-trafficking operation, Edouard also owned and operated Perseverance Borlette ("Perseverance"), a lottery business that he had inherited from his father. Hughes, Hubert, and Sibilia testified that Edouard used the lottery business as a front to launder the proceeds from his drug-trafficking operation. According to Hughes and Hubert, customers would purchase lottery tickets from Perseverance in Haitian currency (gourds), and from 1993 until 1999, the company made approximately 6,000 gourds (or $1,000 U.S.) per month in profit. In 2000, Edouard used the proceeds from his trafficking operation to open several additional Perseverance locations, and the company's profits increased to between $12,000 and $15,000 per month. Although all of the customers used Haitian gourds to buy their lottery tickets, Perseverance employees were paid in U.S. currency.

8

Despite the modest profits generated by the lottery business, bank records showed that Edouard's business account contained millions of dollars in U.S. currency. Bank records also showed that between 1997 and 2004, Edouard had deposited more than $15 million into various Haitian bank accounts and had withdrawn approximately the same amount. Edouard also had deposited millions of dollars into bank accounts held in the names of his children. In addition to accumulating a large amount of cash, according to witnesses, Edouard also owned four houses worth between $200,000 and $400,000 each; a large plot of land worth approximately $2 million; a commercial building in downtown Port-au-Prince purchased for $500,000; an apartment purchased for $200,000; a motel purchased for $5 million; and several luxury automobiles.

In 2003, Edouard attempted to start a rice-selling business. Michelle Pean Berret, owner of a commodities trading company, the Boripea Group, testified that in October 2003, Edouard negotiated a deal to buy rice from her company at a price that would allow him to make a profit on the resale. Edouard ordered 5,000 bags of rice and wired $91,000 to the Boripea Group as payment. The rice was delivered to Miami per Edouard's instructions. In May 2004, Edouard ordered 12,500 metric tons of rice and wired $636,000 to Berret as a deposit for the order. After placing the order, however, Edouard called Berret to cancel and demanded

9

that she refund his deposit. Berret explained that the sale could not be cancelled because her company had already obtained a line of credit to finance the order. She also asserted that her company did not have the funds to refund the entire $636,000 in a single payment. Edouard, however, insisted that his deposit be returned and threatened to kill Berret and her employees if she failed to comply. Thereafter, Berret agreed to refund Edouard's deposit, and, per Edouard's instructions, she issued checks in the amount of $20,000 and $30,000 to Edouard's then-attorney Walter DeLoatch, $50,000 in the name of Celeste Peterson, and $24,000 to Fabiola Edouard. Berret also made wire transfers of $25,000 and $40,000 to Dominican bank accounts.

On June 30, 2005, a grand jury returned a multi-count, superseding indictment charging Edouard with conspiracy to import five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 952(a) and 963 (Count 1); conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1957 (Count 2); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 3-11). The indictment also included a forfeiture count pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853.

At the close of the Government's case, Edouard moved for judgment of acquittal on all counts. The district court denied the motion. Edouard then

announced that he would not call any witnesses or otherwise present evidence. After stating for the record that Edouard had renewed his motion for judgment of acquittal, the court denied Edouard's renewed motion. The jury convicted Edouard on all counts.

## B. Sentencing

On July 20, 2005, the district court sent notice to Edouard's trial counsel, Clayton Kaeiser, that sentencing was scheduled for September 29, 2005. On August 22, 2005, the probation officer mailed Edouard's presentence investigation report ("PSI") to the Government, Edouard, and his counsel. In the PSI, the probation officer calculated Edouard's advisory sentencing range under the Sentencing Guidelines as 360 months to life imprisonment based on a total offense level of 42 and a criminal history category of IV. Kaeiser claimed to have received his copy of the PSI on August 25, 2005. On September 22nd, the Government objected to the PSI on the ground that a two-level enhancement for obstruction of justice had not been applied. The probation officer discussed this objection in an addendum to the PSI dated September 26th ("Addendum"). The Addendum also noted that Edouard had not filed any objections to the PSI.

On September 23rd, Edouard, now represented by Charles Murray, filed an unopposed motion to continue the sentencing hearing, which, as stated above, was

11

scheduled for September 29th. As grounds for the motion, Edouard argued that because Murray had been "recently hired," he did not have sufficient time to review the PSI and prepare for sentencing. On September 26th, the district court denied Edouard's motion.

On September 28th, Edouard filed objections to the PSI. Edouard objected to, inter alia, (1) "the entire conduct portion of the PSI" because the information was based on the false testimony of Government witnesses; (2) the four-level enhancement for leader or organizer because he was never charged with being a leader, had not admitted to being a leader, and the jury had not made such a finding; (3) the Government's proposed enhancement for obstruction of justice because it was based on a false allegation of which he had not admitted and for which he had not been charged; (4) his offense level being based on 150 kilograms of cocaine because he was not charged with and did not admit responsibility for this amount of cocaine; (5) the retroactive application of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.E.2d 621 (2005) to his sentence, as such application violated the Constitution's Ex Post Facto clause; and (6) any sentence above the mandatory minimum, as such a sentence was unreasonable.

At the sentencing hearing on September 30th, both Murray (Edouard's new counsel) and Kaeiser (Edouard's trial counsel) were present. The district court

12

refused to consider the Government's objection to the PSI on the grounds that it was untimely. Edouard acknowledged that his objections were also untimely, but he argued that the court should consider both his and the Government's objections on the grounds that there was no prejudice to either party and the sentence should be based on correct information. The district court responded that local rule required objections to be filed within fourteen days of receipt of the PSI, neither Edouard nor the Government had moved for an extension of time to file objections, and neither party had shown good cause for the untimely filings. The court also noted that Edouard had been represented by counsel throughout the relevant time period. Ultimately, the court refused to consider Edouard's objections. In so concluding, the court stated "I have looked at the objections. I don't want to address the merits of them. You've seen them yourself. He basically is objecting to all factual recitations in the PSI."[1]

During the hearing, Edouard filed a written motion for extension of the sentencing date and permission to file out-of-time objections to the PSI. Again, the district court denied Edouard's motion. After hearing a statement by Edouard and counsel's argument that he should receive a sentence of 120 months'

---

[1] Noting that it had not ruled on Murray's motion to be admitted to practice before the court, the district court granted the motion. Although this motion reflects a filing date of September 29, 2005, it was dated September 14th, and Murray's supporting affidavit was dated September 9th.

13

imprisonment, the district court stated that it had "considered the statements of the parties, the [PSI,] which contains the advisory guidelines, as well as the factors set forth in [18 U.S.C. § 3553(a)]." The court then sentenced Edouard to life imprisonment for Count 1, 240 months' imprisonment for Count 2, and 120 months' imprisonment for Counts 3 through 11, all to be served concurrently. Edouard was also ordered to forfeit approximately $17 million.

## II. DISCUSSION

On appeal, Edouard argues that the district court erred by (1) failing to conduct an inquiry into whether he needed an interpreter and failing to appoint an interpreter for him during his trial; (2) overruling his Batson[2] challenges during jury selection; (3) permitting the Government to introduce extrinsic act evidence in violation of Federal Rule of Evidence ("Rule") 404(b); (4) denying his motion for judgment of acquittal on Count 1 (conspiracy to import cocaine); (5) denying his motion for judgment of acquittal as to Counts 6 through 11 (money laundering); (6) failing to grant a continuance of the sentencing hearing; and (7) failing to consider his out-of-time objections to the presentence investigation report ("PSI"). We address each argument in turn.

---

[2] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

## A.  **Interpreter**

Edouard contends that the district court violated the Court Interpreters Act and his constitutional rights to due process, confrontation of witnesses, effective assistance of counsel, and to be present at his trial by failing to inquire into his need for an interpreter and failing to appoint one.  The appointment of an interpreter, both under the Court Interpreters Act and as a constitutional matter, is committed to the sound discretion of the trial judge, and we review the court's handling of this issue for abuse of discretion.[3]  Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989); Suarez v. United States, 309 F.2d 709, 712 (5th Cir. 1962).[4]  The basic inquiry is whether the failure to provide an interpreter "made the trial fundamentally unfair."  United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980).

The Court Interpreters Act provides that a district court shall utilize an interpreter

---

[3] The parties dispute whether Edouard properly preserved this challenge in the district court.  Edouard contends that his request for an interpreter to translate a question posed by the prosecutor before trial preserved on appeal the issue of whether the district court erred by not conducting an inquiry into his need for an interpreter and by not actually appointing an interpreter for him during the trial.  The Government counters that Edouard raises this contention for the first time on appeal.  We need not address this issue, however, because whether reviewed for abuse of discretion or for plain error, we conclude that the district court committed no error.

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony in such judicial proceedings . . . speaks only or primarily a language other than the English language . . . *so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer*, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

28 U.S.C. § 1827(d)(1) (emphasis added).  Thus, "a defendant is only statutorily entitled to the appointment of an interpreter if the district court determines that the defendant [or a witness]:  (1) speaks only or primarily a language other than the English language; *and* (2) this fact inhibits their comprehension of the proceedings or communication with counsel" or the presiding judicial officer.  United States v. Johnson, 248 F.3d 655, 661 (7th Cir. 2001) (emphasis added).  "Any indication to the presiding judicial officer that a criminal defendant speaks *only or primarily* a language other than the English language should trigger the application of Sections (d) and (f)(1) [defendant's waiver of the right to an interpreter] of the Court Interpreters Act."  Tapia, 631 F.2d at 1209 (emphasis added).  Thus, the Act places "on the trial court a mandatory duty *to inquire as to the need* for an interpreter *when a defendant has difficulty with English*."  Valladares, 871 F.2d at 1565-66 (citing Tapia, 631 F.2d at 1209) (emphasis added); United States v. Osuna, 189 F.3d 1289, 1292 (10th Cir. 1999) (stating that the Court Interpreters Act places on the district court "a mandatory duty to inquire as to the need for an interpreter

16

when a defendant has difficulty with English") (quoting Valladares, 871 F.2d at 1566 and citing Tapia, 631 F.2d at 1209); Luna v. Black, 772 F.2d 448, 451 (8th Cir. 1985) (stating that a trial court should determine whether an interpreter is needed when put on notice that there may be some significant language difficulties); United States v. Carrion, 488 F.2d 12, 15 (1st Cir. 1973) (holding that "whenever put on notice that there may be some significant language difficulty, the court should make such a determination of need [for an interpreter]"). Trial courts may be put on notice of the defendant's "difficulty with English" where the defendant is "arraigned through an interpreter," Tapia, 631 F.2d at 1209, where the defendant "testifies in his own behalf through the use of an interpreter," id., where there are several places in the trial transcript where the court reporter noted that the defendant's testimony was unintelligible, United States v. Black, 369 F.3d 1171, 1175 (10th Cir. 2004), or when it is otherwise "clear that the defendant's communication with the court or counsel is inhibited by language[,]" Johnson, 248 F.3d at 661.

As a constitutional matter, in determining whether an interpreter is needed, the trial court must balance the defendant's rights to due process, confrontation of witnesses, effective assistance of counsel, and to be present at his trial "against the public's interest in the economical administration of criminal law." Valladares,

17

871 F.2d at 1566 (citing <u>United States v. Martinez</u>, 616 F.2d 185, 188 (5th Cir. 1980)).

Edouard is a native of Haiti, and his native language is Haitian Creole. Shortly before his trial commenced, the district court addressed a conflict of interest involving Edouard's previous attorney, Walter Deloatch, who had accepted two checks from Edouard that were the subject of Counts 10 and 11 (money laundering) of the superseding indictment. The court removed Deloatch as Edouard's trial counsel, but Deloatch had continued to confer with Edouard's newly-appointed trial counsel, Clayton Kaeiser. The court and the prosecutor questioned Edouard directly to determine whether Deloatch's continued involvement had impeded his defense.

| | |
|---|---|
| The Court: | Well, I just want to make sure Mr. Edouard, you're present. Do you have any problem with Mr. Kaeiser in his representation of you? You understand he's your lawyer? |
| The Defendant: | If I have any problem with him? |
| The Court: | Right. |
| The Defendant: | I don't have any problem. |
| The Court: | Okay. Anything else? |
| Ms. Kirkpatrick: | Only that, you know, if Mr. Deloatch has in fact been involved, does he feel that conflict that Mr. Deloatch—that he's aware of that Mr. Deloatch |

18

has, has in any way impeded his defense.

The Court: All right, did you understand the question, Mr. Edouard?

The Defendant: I'm sorry, repeat that for me again.

Ms. Kirkpatrick: If Mr. Deloatch's involvement in any aspect of this defense has impeded his conflict-free representation by Mr. Kaiser, does he feel that Mr. Deloatch's involvement in any way has, because of the conflict that the Court has already found, interfered with his defense.

The Defendant: Could the interpreter translate for me, please? Because I really want to understand everything very well.

The Court: I'm not sure I understand it either. That's why I don't want to ask it.

Ms. Kirkpatrick: Your honor, may I address the Defendant directly?

The Court: Sure.

Ms. Kirkpatrick: Mr Edouard, it is my understanding that Mr. Deloatch has come to meet with you during your defense. You understand that Mr. Deloatch has conflicted off of your case because of his involvement in counts number 10 and 11; that is, he received the checks made out to him in counts number 10 and 11. So the Court told him he couldn't be involved in your case. It's my understanding that he continued to meet with you. Do you feel that him—his continuing to meet with you has interfered in your right to a conflict-free defense by Mr. Kaeiser?

19

The Defendant:     I don't really understand well.  I don't want to say something and not understand exactly what it is.

Ms. Kirkpatrick:   Your Honor, this kind of raises a whole new concerns [sic] about an interpreter for me at this point.

The Court:         Well, I think its your question.  I mean, it's incomprehensible.

Ms. Kirkpatrick:   Do you feel you have had a conflict-free defense?

The Defendant:     If I really want him to represent me?

Ms. Kirkpatrick:   No, do you think that Mr. Deloatch meeting with you has caused you any problems in your defense?

The Defendant:     No.

Ms. Kirkpatrick:   You have no problems with Mr. Kaeiser?

The Defendant:     No problem at all.

Ms. Kirkpatrick:   And if Mr. Deloatch is not involved, you're okay with that?

The Defendant:     Yes.

Ms. Kirkpatrick:   Okay, I think that was—

The Court:         Okay.  What's next?

Edouard argues that his request for an interpreter during this exchange

triggered the district court's duty under the Court Interpreters Act to inquire into

his need for an interpreter.  According to Edouard, the district court ignored his

request for an interpreter and "his repeated indications that he did not understand." To that end, he argues that the district court's failure to conduct this inquiry necessitates a remand to allow the court to conduct the required inquiry. We disagree.

It is not apparent from the record that Edouard had such "difficulty with English" so as to trigger the district court's duty to inquire into whether Edouard's language difficulties would inhibit his comprehension of the proceedings or communications with his counsel and the district judge. See Valladares, 871 F.2d at 1565. First, pre-trial proceedings, such as Edouard's arraignment before the magistrate court and a hearing regarding the Government's motion for a Garcia hearing, were conducted entirely in English, and there is no indication that Edouard expressed a need for an interpreter during those proceedings. Second, Edouard's request for an interpreter to translate a specific question posed by the prosecutor—a question the district court deemed incomprehensible—suggested that Edouard had trouble understanding the awkwardly-phrased question. Once the question was re-phrased, at the court's direction, Edouard answered it in English and evinced no broader difficulty understanding or speaking English. Thus, rather than "ignore" Edouard's request, the court ensured that the prosecutor's question was re-phrased so that Edouard (and the court) could understand it before the

21

proceedings continued.

Third, although the trial was conducted primarily in English, Creole-speaking interpreters were available during the trial and assisted in translating the testimony of, and/or counsels' questions to, several witnesses, including Eddy Aurelien, Michelle Pean Berret, and Oriel Jean. Fourth, co-conspirator Clifford Sibilia testified that when he spoke with Edouard approximately one month before Edouard's trial while they were both in federal custody, they spoke to each other in Creole *and* English. Finally, three of Edouard's co-conspirators testified in English, including Sibilia and Edouard's brothers, Hughes and Hubert. Nothing in the record indicates that Edouard had difficulty comprehending their testimony.

Hence, the record in this case is quite different from that in Tapia (on which Edouard heavily relies), as in that case, the defendant was arraigned through an interpreter and the defendant testified in his own behalf using an interpreter.[5] Tapia, 631 F.2d at 1209. On those facts, the former Fifth Circuit determined that the district court should have been aware that the defendant spoke "only or primarily a language other than English" and therefore should have inquired whether the failure to appoint an interpreter for the defendant would inhibit his comprehension of the proceedings. Id. ("We believe that *in this case* when the

_____

[5] As stated above, Edouard did not testify during his trial.

22

defendant Tapia was arraigned through an interpreter, the Court below, on its own motion, should have inquired whether the failure to have an interpreter with him throughout the proceedings inhibited Tapia's comprehension of the proceedings and communications with his counsel." (emphasis added)).  Indeed, in United States v. Perez, the Fifth Circuit distinguished Tapia on the ground that "the need for translation of the pretrial proceeding put the district court on notice of the need to make inquiry regarding the defendant's language competency."  918 F.2d 488, 490 (5th Cir. 1990).  On the record before us in this case, we cannot say that the district court was put on such notice.  Accordingly, we hold that the district court did not err by failing to conduct further inquiry into whether Edouard's comprehension of the proceedings or communications with his counsel and the court would be inhibited by difficulty with the English language.

For these same reasons, we likewise conclude that the district court did not err by failing to appoint an interpreter, as nothing in the record demonstrates that the lack of an interpreter rendered Edouard's trial "fundamentally unfair."  See United States v. Joshi, 896 F.2d 1303, 1309 (11th Cir. 1990).  Edouard argues that in addition to the pretrial exchange excerpted above, his need for an interpreter was made apparent after the verdict was returned when the court asked if he wished to waive his right to a jury determination on the issue of forfeiture.

23

The Court:      Mr. Edouard, are you comfortable waiving your right to a jury on the forfeiture issue?

Mr. Kaeiser:    I don't really think he understands. Let me explain to him.

The Court:      Mr. Kaeiser, if you need more time to talk to him about it, if you don't feel comfortable doing it now, we can take it up another time. . . .

                * * *

Mr. Kaeiser:    Judge, he is willing to waive jury. We can go on the record and he is willing to waive.

The Court:      I want to make sure. Have you had an opportunity to discuss with your attorney if you want to proceed on the forfeiture by way of jury or non-jury Mr. Edouard?

The Defendant:  It's up to you.

The Court:      It's your decision, it's not mine.

The Defendant:  I really want to know because there is a lot of things I want to see—

Mr. Kaeiser:    —he is more concerned about the sentencing at this time, Judge.

The Court:      I think he needs more time to discuss this.

                * * *

The Court:      At least give him a chance to discuss it with his attorney and make sure that whatever decision you make, Mr. Edouard, you have had an opportunity to discuss it with your attorney, so you know

24

exactly what decision you are making with respect to the forfeiture independent of the quantity of cocaine.

The Defendant:    What about the appeal?

The Court:    That's going to be separate as well. I will tell you that if you don't already know that, but at the time of sentencing you will be told again of your opportunity to appeal your conviction.

The Defendant:    Thank you.

According to Edouard, this exchange evidenced the fact that he "failed to understand the trial proceedings and the proceedings after trial as well." We disagree.

Although Edouard did not respond to the court's question, his attorney's response did not suggest a language barrier but, as the Government contends, a need to explain the legal ramifications of Edouard's decision regarding whether to waive a jury on the issue of forfeiture. Rather than injudiciously accepting the response proffered by Edouard's attorney, the judge insisted that Edouard discuss the issue with his attorney before making an on-the-record decision. Furthermore, Edouard's follow-up question regarding his appeal indicated that comprehension of legal ramifications, rather than language difficulties, were at issue during this exchange. In this, we cannot say that Edouard failed to understand his trial proceedings or that his communications with the court and his attorney were so

25

impaired as to violate his constitutional rights.

## B.  The Government's Use of Peremptory Challenges

Edouard also argues that the Government's use of four of its five peremptory challenges to strike black venirepersons violated his constitutional rights to due process and a fair trial.  "We review for clear error a trial judge's finding that a prosecutor has exercised peremptory strikes free of discriminatory intent."  United States v. Houston, 456 F.3d 1328, 1335 (11th Cir. 2006).  "The judge's assessment of the prosecutor's credibility is entitled to 'great deference.'"  Id. (citing Batson v. Kentucky, 476 U.S. 79, 98 n.21, 106 S.Ct. 1712, 1724 n.21, 90 L.Ed.2d 69 (1986)).

We examine claims of racial discrimination in jury selection under the framework set forth by the Supreme Court in Batson.  First, the defendant must make a prima facie showing[6] that the peremptory strike at issue was exercised on the basis of a juror's race.  Batson, 476 U.S. at 93-94, 106 S.Ct. at 1721.  Once the prima facie case is established, the burden shifts to the government to rebut the inference of discrimination "by articulating legitimate, race-neutral reasons for"

---

[6] "In making out a prima facie case, the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal."  United States v. Allison, 908 F.2d 153, 1538 (11th Cir. 1990) (quotation marks omitted).  The defendant must point to "facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons."  Id. (citation omitted).

26

striking the juror in question. Houston, 456 F.3d at 1335 (citing Batson, 476 U.S. at 94, 106 S.Ct. at 1721).

After the government articulates such reasons, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 98, 106 S.Ct. at 1724. "At this stage, the persuasiveness of the prosecutor's justification for his peremptory strike" is critical. Atwater v. Crosby, 451 F.3d 799, 806 (11th Cir. 2006). "'[I]mplausible or fantastic justifications' may be found to be pretextual, and in these cases, the question is whether the prosecutor's race neutral explanations are credible." Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 338-39, 123 S.Ct. 1029, 1040 154 L.Ed.2d 931 (2003)). Accordingly, the court must evaluate the credibility of the stated justifications based on the evidence before it. Houston, 456 F.3d at 1335. This credibility determination is "a pure issue of fact, subject to review under a deferential standard . . . [and] peculiarly within a trial judge's province." Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991) (plurality opinion).

During voir dire, Edouard made Batson objections after the Government used its peremptory challenges to strike four black venirepersons. In response to Edouard's first Batson objection, the prosecutor stated that he had struck the

27

venireperson because her "English could be an issue."  The district court overruled Edouard's objection, stating that the prosecutor had "given a race neutral reason" for the strike.  In response to Edouard's second Batson objection, the prosecutor explained that it had struck the juror in question because the man was wearing sunglasses and it was therefore difficult to determine his reactions to certain questions.  After hearing the prosecutor's explanation, the court summarily overruled Edouard's objection without stating the reason for its decision.

In response to Edouard's third Batson objection, the prosecutor contended that he had struck the venireperson because she was unemployed and it was very difficult to understand her answers to questions.  As with Edouard's previous Batson objection, the court summarily overruled this objection without explanation.  And in response to Edouard's fourth and final Batson objection, the prosecutor contended that he had struck the venireperson "because she answered the questions very quickly," neither he nor his co-counsel were "able to write down anything she had to say," and they therefore knew "nothing about her."  The prosecutor also stated that there was only one other venireperson remaining, he knew "a lot more or some important things about" the remaining venireperson than he did about the black female he sought to strike, and it was his "call" as to which of the remaining venirepersons he would strike.  Concluding that the prosecutor's

28

proffered rationale was a "strategic reason," the district court overruled Edouard's objection.

We note at the outset that in overruling all four of Edouard's Batson objections, the district court never explicitly determined whether Edouard made out a prima facie case of discrimination. "Our precedent clearly holds that the establishment of a prima facie case is an 'absolute precondition' to the prosecution's burden to articulate race-neutral reasons for the exercise of its strikes." Houston, 456 F.3d at 1335 (citing United States v. Ochoa-Vasquez, 428 F.3d 1015, 1038 (11th Cir. 2005)). Nevertheless, the district court considered the prosecution's non-discriminatory reasons for exercising the strikes and thereafter overruled each of Edouard's objections. As such, the question of whether Edouard made out the prima facie case is moot. See Hernandez, 500 U.S. at 358, 111 S.Ct. at 1866 (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

We also note that the district court improperly condensed the second and third steps of the Batson inquiry by summarily overruling Edouard's objections and/or failing to consider whether Edouard had refuted the race-neutral

29

explanations proffered by the Government. As this court stated in Atwater, however, "the failure to address each of Batson's steps creates the risk of serious constitutional error." Atwater, 451 F.3d at 807.

Nevertheless, given the great deference afforded to the determinations of trial courts regarding the believability of the prosecutor's race-neutral explanations for its strikes, we cannot conclude that the district court clearly erred in overruling Edouard's Batson objections. Although Edouard argues that the prosecutor's reasons for striking the black venirepersons were "vague," "arbitrary," "impulsive," and "ungenuine," in our view, those explanations were not so "implausible or fantastic" as to be found pretextual or incredible. See Atwater, 451 F.3d at 806. First, the prosecutor "was forthcoming and non-evasive in his statement of his reasons for exercising his strikes." Houston, 456 F.3d at 1337. In addition, there is no evidence that the prosecutor failed to strike similarly-situated white jurors. See id. at 1335 ("[I]f the prosecutor's stated reason for striking black venire members applies with equal force to white venire members, and the similarly situated white members are not struck, that is evidence tending to prove purposeful discrimination at Batson's third step."). Moreover, at least three black jurors served unchallenged on the sworn panel. "Although the presence of African-American jurors does not dispose of an allegation of race-based

30

peremptory challenges, it is a significant factor tending to prove the paucity of the claim." United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir. 1995). On this record, we find no clear error, and thus Edouard's Batson claim fails.

## C. Admission of Evidence Under Rule 404(b)

Edouard also argues that the district court erred in admitting extrinsic evidence of "other crimes" in violation of Rule 404(b), namely, his brothers' testimony concerning his cocaine-smuggling activities during the years before the conspiracy identified in the indictment and Michelle Pean Berret's testimony that Edouard had threatened to kill her. Ordinarily, a district court's evidentiary rulings are reviewed for abuse of discretion. Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir. 2002). But where, as here, the defendant failed to preserve his challenge to an evidentiary ruling by contemporaneously objecting, our review is for plain error.[7] United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007).

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's character in order to show action in conformity therewith. Fed. R. Evid. 404(b). Such evidence "may, however, be admissible for

---

[7] Under plain error review, there must be (1) an error, (2) that is plain, and (3) that affects the defendant's substantial rights. United States v. Shelton, 400 F.3d 1325, 1328-29 (11th Cir. 2005). For an error to affect substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). If the first three conditions of the plain error test are met, we may correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Shelton, 400 F.3d at 1329.

other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). For evidence of other crimes or acts to be admissible under Rule 404(b), (1) it must be relevant to an issue other than defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403.[8] United States v. Chavez, 204 F.3d 1305, 1317 (11th Cir. 2000).

But evidence of criminal activity other than the charged offense is *not* "extrinsic" under Rule 404(b), and thus falls outside the scope of the Rule, when it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Baker, 432 F.3d 1189, 1205 n.9 (11th Cir. 2005) (quoting United States v. Veltmann, 6 F.3d 1483, 1498 (11th Cir. 1993)).

[8] Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. But "Rule 403 is an extraordinary remedy[,] which should be used only sparingly[,]" and the balance "should be struck in favor of admissibility." United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006) (internal quotation marks omitted). Thus, in "reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." United States v. Brown, 441 F.3d 1330, 1362 (11th Cir. 2006).

"Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive[,] and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998). And evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." United States v. Foster, 889 F.2d 1049, 1053 (11th Cir. 1989). Nonetheless, evidence of criminal activity other than the charged offense, whether inside or outside the scope of Rule 404(b), must still satisfy the requirements of Rule 403. Baker, 432 F.3d at 1219 n.36.

### 1. *Edouard's Pre-1998 Drug Smuggling*

Here, the superseding indictment alleged that beginning "in or about 1998, and continuing until in or about July 2004," Edouard conspired to import cocaine into the U.S. During Edouard's trial, the Government presented testimony that from 1995 to 1996, Edouard had imported cocaine into the U.S. via couriers, including his brothers, who hid the cocaine in their clothing and flew to New York on commercial airliners. On appeal, Edouard argues that evidence of these "prior

33

bad acts" was admitted in violation of Rule 404(b), as these acts occurred three years before the conspiracy alleged in the indictment had commenced, and the Government "had no need" for this evidence to prove his intent. He also argues that these prior acts are different from the evidence adduced at trial regarding the charged conspiracy because the latter "occurred on a much larger scale." The Government responds that testimony regarding Edouard's past cocaine-smuggling activities with his brothers was "inextricably intertwined" with the evidence regarding the charged offenses and is outside the scope of Rule 404(b). The Government also contends that even if this evidence was not inextricably intertwined with the charged offenses, it was nonetheless admissible under Rule 404(b). We agree with the latter assertion.

Regarding the first prong of the Rule 404(b) test, the Government argues that Edouard's prior drug-smuggling activities with his brothers was relevant to whether he possessed the requisite intent regarding the cocaine-trafficking conspiracy charged in the superseding indictment. We agree. "A defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." United States v. Zapata, 139 F.3d 1355, 1358 (11th Cir. 1998). "Where the

34

extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses." United States v. Dorsey, 819 F.2d 1055, 1059 (11th Cir. 1987). Thus, where the state of mind required for the charged and extrinsic offenses is the same, the first prong of the Rule 404(b) test is satisfied. Id.; United States v. Dickerson, 248 F.3d 1036, 1047 (11th Cir. 2001).

In this case, Edouard's charged offenses include, inter alia, conspiracy to import cocaine into the U.S. from 1998 to 2004. By pleading not guilty, Edouard made his intent a material issue. See Zapata, 139 F.3d at 1358. And the extrinsic acts about which Edouard's brothers testified involved a conspiracy, headed by Edouard, to import cocaine into the U.S. from 1995 to 1996. Thus, the charged offense and the prior uncharged offense involved the same mental state. Accordingly, the first prong of the analysis is satisfied.

We also conclude that the second prong is satisfied. Here, Hughes and Hubert testified that in 1995, they and others smuggled cocaine for Edouard from Haiti to New York on commercial airliners in return for payment. Although both brothers testified in exchange for possible reductions in their sentences, Edouard presented no evidence to rebut their testimony. Thus, a jury could have found by a preponderance of the evidence that Edouard committed this extrinsic conduct. See

35

Chavez, 204 F.3d at 1317.

Regarding the third prong, "[w]hether the probative value of Rule 404(b) evidence outweighs its prejudicial effect depends upon the circumstances of the extrinsic offense." Dorsey, 819 F.2d at 1062. Factors to be considered include whether it appeared at the commencement of trial that the defendant would contest the issue of intent, the overall similarity of the charged and extrinsic offenses, and the temporal proximity between the charged and extrinsic offenses. Id. Here, as discussed above, Edouard pleaded not guilty to the charged offenses, making the issue of intent a contested issue. Moreover, although the prior smuggling activities involved couriers importing cocaine on their persons and the charged conspiracy involved, inter alia, importing cocaine via suitcases and cargo containers, both the previous and the instant offenses involved smuggling multiple kilograms of cocaine from Haiti into New York via commercial airliners. In addition, the activities forming the basis of the charged conspiracy began in 1998, only two years after the extrinsic smuggling-activities had ended. And this court's case law contradicts Edouard's assertion that this two-year span rendered his 1995-1996 activities too remote to be admitted into evidence. See, e.g., United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir. 1997) (concluding that a six-year span did not render the extrinsic acts too remote for proper consideration); United States

36

v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995) (concluding that a fifteen-year span did not render the extrinsic acts too remote for proper consideration); United States v. Pollock, 926 F.2d 1044, 1048 (11th Cir. 1991) (concluding that a five-year span did not render the extrinsic conduct too remote for proper consideration). Finally, any unfair prejudice possibly caused by admitting evidence of Edouard's prior smuggling activities was mitigated by the district court's limiting instruction to the jury. See United States v. Diaz-Lizaraza, 981 F.2d 1216, 1225 (11th Cir. 1993). Thus, the probative value of the evidence in question was not substantially outweighed by undue prejudice.

Because all parts of the Rule 404(b) test are satisfied, we conclude that the district court did not commit plain error by admitting evidence of Edouard's drug-smuggling in 1995 and 1996.

### 2. Edouard's Threat to Kill Berret and Her Employees

As discussed above, Michelle Pean Berret testified that Edouard had threatened to kill her and her employees if she did not return the $636,000 deposit he had paid to her company in exchange for rice. On appeal, Edouard argues that the district court committed plain error by allowing this testimony. According to Edouard, the threat was only relevant to his character, it did not "show a consciousness of guilt," it was not made "to further any conspiracy," and any

37

probative value was substantially outweighed by its prejudicial effect. The Government counters that Berret's testimony concerning Edouard's threat explained why she returned a portion of the deposit and why she returned it in the precise manner that she did (that is, via four different checks, including two issued to Edouard's attorney, and two wire transfers). According to the Government, Berret's testimony regarding Edouard's threat was an integral part of her testimony explaining how Edouard laundered these funds. We agree.

Here, Berret testified that Edouard threatened to kill her and her employees if she did not return his $636,000 deposit from his cancelled rice purchase. These funds (including Berret's return of approximately $189,000 of these funds via four checks and two wire transfers) are the subject of seven of the money laundering counts charged in the superseding indictment. Thus, Berret's testimony regarding Edouard's threat formed an "integral and natural part" of her account of the circumstances surrounding the offenses for which Edouard was indicted. See Foster, 889 F.2d at 1053. As such, Berret's testimony regarding Edouard's threat falls outside the scope of Rule 404(b). See Baker, 432 F.3d at 1205 n.9. And even accepting Edouard's argument that Berret's testimony regarding the threat had minimal probative value, it is doubtful that this testimony caused any *unfair* prejudice considering the overwhelming evidence of Edouard's guilt. Indeed, "in a

criminal trial[,] relevant evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." United States v. King, 713 F.2d 627, 631 (11th Cir. 1983) (emphasis added). Accordingly, we cannot say that the district court plainly erred by admitting this testimony.

### D. Single or Multiple Conspiracies

#### 1. Whether Material and Prejudicial Variance Occurred

Edouard contends that the Government failed to prove the single, overarching conspiracy to import cocaine as charged in Count 1 of the superseding indictment. He argues that the Government's evidence actually showed multiple conspiracies, thereby creating a material variance between the proof advanced at trial and the offense charged in the indictment.

We will not reverse a conviction "because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is [1] material *and* [2] substantially prejudiced the defendant[]." United States v. Alred, 144 F.3d 1405, 1414 (11th Cir. 1998) (emphasis added). "The arguable existence of multiple conspiracies . . . does *not* constitute a *material* variance from the indictment if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a single conspiracy

existed beyond a reasonable doubt." United States v. Suarez, 313 F.3d 1287, 1289 (11th Cir. 2002) (emphasis added). "Thus, the jury makes the initial determination of whether the evidence supports a single conspiracy and their determination will not be disturbed if supported by substantial evidence." Calderon,127 F.3d at 1327. If we conclude that there is a material variance, we then determine whether the existence of more than one conspiracy resulted in any substantial prejudice to the defendant. Id.

To determine whether the jury could have found a single conspiracy, "we consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." Id. "[T]he government must show an interdependence among the alleged co-conspirators." United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004). Separate transactions, however, are not necessarily separate conspiracies, "so long as the conspirators act in *concert* to further a common goal." Id. (emphasis in original). "[I]f a defendant's actions facilitated the endeavors of other co[-]conspirators or facilitated the venture as a whole, then a single conspiracy is shown." Id. (citation and internal quotation marks omitted). "It is irrelevant that particular conspirators may not have known other conspirators or [may not] have participated in every stage of the conspiracy; all that the government must prove . . . is an agreement or *common purpose* to

40

violate the law and intentional joining in this goal by co[-]conspirators." Alred, 144 F.3d at 1415 (emphasis added). And "[i]n a drug conspiracy, in which the object of the conspiracy is clearly illegal and there are various clandestine functions to perform, the conspirators can be charged with knowledge that others are performing these different functions." Chandler, 388 F.3d at 811 n.21. Thus, the finding of a single conspiracy is permitted where a "key man" directs and coordinates the activities and individual efforts of various combinations of people. United States v. Anderson, 326 F.3d 1319, 1327-28 (11th Cir. 2003).

Here, viewing the evidence in the light most favorable to the Government, we conclude that there was no material variance because there was substantial evidence from which a reasonable jury could have found beyond a reasonable doubt that there was a single, overarching conspiracy to import cocaine into the U.S. and that Edouard was the leader of that conspiracy. First, all of the conspirators shared a common goal—importing cocaine from Haiti into the U.S.—and each conspirator's actions facilitated the achievement of this goal. For example, Aurelien was responsible for "picking up" the cocaine in Haiti and delivering it to Edouard to be shipped to the U.S. Jean and Lestin ensured that Edouard was able to transport his cocaine within Haiti and through the Port-au-Prince airport without police interference. Sibilia was responsible for the cargo-

41

boat shipments to Miami. And Hughes and Hubert were responsible for, inter alia, selling the cocaine once it arrived in the U.S. and sending the proceeds to Edouard in Haiti.

Next, several of Edouard's co-conspirators testified in detail about their knowledge of the various aspects of Edouard's drug-trafficking enterprise, including transactions in which they did not participate directly. For example, Hughes, who actively participated in smuggling cocaine from Haiti into New York and Miami via commercial airliners, testified in detail about Edouard's use of cargo boats to smuggle cocaine into Miami. Aurelien testified that the cocaine he "picked up" for Edouard in Haiti was smuggled into New York and Miami, and the proceeds from the sales of this cocaine were smuggled into Haiti via commercial airliners. And Aurelien, Hughes, and Sibilia testified that Haitian police officials Jean and Lestin helped to protect Edouard's cocaine shipments from police interference.

Finally, there was an overlap of participants. Sibilia, who was involved in Edouard's transactions with Ketant and the cargo-boat shipments from Haiti to Miami, testified that he twice smuggled cocaine into New York using Edouard's commercial-airline smuggling system and was paid by Hughes after the cocaine was sold. And Aurelean testified that he "was the one doing all of the [cocaine]

42

pickups for [Edouard]" in Haiti and that this cocaine was sent to New York and Miami. From this, a reasonable juror could conclude that at least some of this cocaine was smuggled into New York and Miami using cargo-boats (involving Sibilia) and commercial airliners (involving Hughes).

Nevertheless, even if a variance had occurred (and, again, we conclude that it did not), Edouard's claim still fails because he has not shown that he suffered substantial prejudice as a result. Here, Edouard was the only defendant at trial, and the superseding indictment generally charged him with conspiring "with other persons both known and unknown" to import cocaine into the U.S. Edouard failed to explain how "the proof at trial differed so greatly" from the conspiracy charged in the superseding indictment that he "was unfairly surprised and was unable to prepare an adequate defense." See Alred, 144 F.3d at 1415. As such, Edouard has not demonstrated that he was substantially prejudiced from any variance between the conspiracy charged in the superseding indictment and the evidence produced at trial. Accordingly, we affirm Edouard's conviction on Count 1.

### 2. *Jury Instruction Regarding Multiple Conspiracies*

Edouard also argues that he was entitled to a jury instruction regarding multiple conspiracies. "[Although] generally it is for the jury to determine whether one or several conspiracies existed, whether the defense produced sufficient

43

evidence to sustain an instruction such as a multiple conspiracy is a question of law." United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999) (citations omitted). In determining whether to give an instruction for multiple conspiracies, the district court "considers whether there is sufficient evidence for a reasonable jury to conclude that some of the [co-conspirators] were involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." Id. As discussed above, however, we conclude that the Government did prove the single conspiracy charged in the superseding indictment. And "[t]o the extent there might have been subgroups operating pursuant to the general conspiracy, the evidence, viewed in the best light for the government, demonstrated they were all acting in furtherance of one overarching plan." Id. Accordingly, the district court committed no error in not giving a multiple conspiracy instruction.

E. **Sufficiency of the Evidence Regarding Money Laundering Counts 6-11**

Edouard further argues that the evidence was insufficient to sustain his convictions for Counts 6 through 11 of the superseding indictment because the transactions serving as the bases of those counts were due to the inability of the Boripea Group, Michelle Berret's rice-trading company, to return his $636,000 deposit in a single payment. According to Edouard the "legislative intent" of 18 U.S.C. § 1957, the money laundering statute, "does not square with separate

convictions for each instance in which Boripea issued a refund check" to him.

"We review the sufficiency of the evidence de novo, viewing "the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996). "We must affirm the appellant['s] convictions unless, under no reasonable construction of the evidence, could the jury have found the appellant[] guilty beyond a reasonable doubt." United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005). Thus, "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably *could have* acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006) (emphasis added).

Section 1957 provides, in pertinent part, that "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished." 18 U.S.C. § 1957(a). The term "monetary transaction" is defined by the statute as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." Id. § 1957(f)(1). The

term "criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense." Id. § 1957(f)(2).

After reviewing the record, we conclude that the evidence presented at trial was sufficient to support Edouard's convictions on Counts 6 through 11. Hughes and Hubert testified that Edouard's only source of legitimate income was the family lottery business. At most, this business generated an average of $15,000 per month in profits, which Edouard shared with his brothers and used to pay his employees. Indeed, Sibilia testified that Edouard told him that although the lottery business generated little profit, it served as a "legitimate" front for his drug-trafficking operation. The Government also presented evidence that despite the modest profits generated by the lottery business, Edouard had acquired millions of dollars in residential and commercial real estate and had deposited millions of dollars into Haitian bank accounts held in the names of his children. On this record, a reasonable juror could conclude that Edouard funded the $636,000 deposit he made to the Boripea Group from the proceeds of his drug-trafficking operation. And because the $189,000 refund Edouard received from the Boripea Group via six separate transactions was part of the ill-gotten $636,000 deposit, the jury was entitled to find that these six separate transactions, each exceeding $10,000, constituted money laundering in violation of § 1957. Although the

46

Boripea group's "financial difficulties" may have been the reason why Edouard did not receive his refund in a single transaction, the evidence established that *Edouard* directed the *mode* of *each* transaction (that is, wire transfer or check) and to *whom each* transfer was made (for example, to Edouard's former attorney). Accordingly, we affirm Edouard's convictions on Counts 6 through 11.

### F. Motion to Continue Sentencing

Edouard also argues that the district court erred by denying his motion to continue his sentencing hearing. We review a district court's denial of a motion to continue sentencing for abuse of discretion. United States v. Lee, 427 F.3d 881, 896 (11th Cir. 2005). The defendant has the burden to demonstrate that "the denial was an abuse of discretion and that it produced specific substantial prejudice." United States v. Smith, 757 F.2d 1161, 1166 (11th Cir. 1985). In determining whether the denial of a motion for continuance was proper, we must decide "in light of the circumstances presented, focusing upon the reasons for the continuance offered to the trial court when the request was denied." United States v. Knowles, 66 F.3d 1146, 1160-61 (11th Cir. 1995). For example, in assessing motions to continue a criminal trial, this court has considered "the quantum of time available for preparation, the likelihood of prejudice from denial [of the motion for continuance], the accused's role in shortening the effective preparation time, the

degree of complexity of the case, and the availability of discovery from the prosecution." United States v. Garmany, 762 F.2d 929, 936 (11th Cir. 1985).

After a thorough review of the record, we conclude that the trial court did not abuse its discretion in denying Edouard's motion for continuance. In his motion, Edouard asserted that his attorney, Murray, "has been recently hired as counsel and has not had sufficient time to review the [PSI] and prepare for sentencing." But Edouard's motion provided no details as to *when* his new counsel was retained, merely stating that Murray had been "recently hired." Nevertheless, Murray's affidavit in support of his motion to be admitted to practice before the court was dated September 9, 2005, and Murray and Kaeiser had stipulated to substitution of counsel on September 8th. Yet no explanation was provided as *why* the motion for continuance was not filed until September 23rd—*fourteen days after* the date Murray and Kaeiser had stipulated to substitution of counsel and only *six days before* Edouard's scheduled sentencing hearing.

Edouard contends that the district court's denial of his motion caused him "harm" in that "his meritorious objections to the PSI were not considered" before sentencing. But, as discussed below, we conclude that the district court's refusal to consider the merits of those objections was not an abuse of discretion. Moreover, even had the court granted his motion for continuance, it does not necessarily

48

follow that the court would have also granted his motion to file out-of-time objections to the PSI. This is especially so where the court stated that it had "looked at the objections" and concluded that Edouard was "basically objecting to all factual recitations in the PSI."

For these reasons, we cannot say that the district court abused its discretion by denying Edouard's motion for continuance.

### G. Consideration of Out-of-Time Objections to the PSI

Finally, Edouard argues that the district court erred by failing to allow him to file out-of-time objections to the PSI and failing to consider those objections. A district court's refusal to consider the merits of untimely objections to the PSI is reviewed for abuse of discretion. United States v. Jones, 70 F.3d 1009, 1010 (8th Cir. 1995) (finding no abuse of discretion in the district court's decision not to consider an untimely objection to the PSI); United States v. Morsley, 64 F.3d 907, 914 (4th Cir. 1995) (holding that the district court had discretion to refuse to rule on untimely objections to PSI).

Rule 32 of the Federal Rules of Criminal Procedure provides that "[w]ithin 14 days after receiving the [PSI], the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the [PSI]." Fed. R. Crim. P.

32(f)(1). For good cause shown, however, the district court can either change this time limit, see Fed. R. Crim. P. 32(b)(3), or allow a party to make a new objection any time before the sentence is imposed, see Fed. R. Crim. P. 32(i)(1)(D). Southern District of Florida Local Rule 88.8(4) also provides that "[w]ithin fourteen (14) days of receipt of the [PSI], counsel for the defendant and the government must communicate any objections, in writing, to each other and to the probation officer." S.D. Fla. L.R. 88.8(4).

Here, Edouard's trial counsel, Kaeiser, claimed to have received the PSI on August 25, 2005. Edouard claims that he did not receive the PSI until fourteen days before the September 30th sentencing hearing "because he had been housed in the Special Housing Unit." Yet Edouard has not explained, either in his brief or at sentencing, *why* his being housed in the Special Housing Unit made it so that he did not receive his copy of the PSI until some twenty-two days *after* Kaeiser had received it. And Edouard provides no other explanation for why Kaeiser failed to file objections to the PSI *or* move for an extension of time to file such objections during the fourteen-day period between August 25th (when Kaeiser received the PSI) and September 8th (the date Kaiser and Murray stipulated to substitution of counsel). Regardless of when Kaeiser was actually "fired," Kaeiser could not withdraw his appearance in the matter except by leave of court pursuant to

50

Southern District of Florida Local Rule 11.1(D)(3).  <u>See</u> S.D. Fla. L.R. 11.1(D)(3).

Nor has Edouard explained why Murray failed to file objections to the PSI until

September 28th—twenty days after he stipulated to substitution of counsel.  On

this record, we cannot say that the district court's refusal to consider the merits of

Edouard's untimely objections was an abuse of discretion.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM**.