[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Nov. 17, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12826
Non-Argument Calendar

_____

D. C. Docket No. 07-80119-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LYNROY GAYLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 17, 2009)

Before BIRCH, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

Lynroy Gayle ("Gayle") appeals his convictions and sentences for

conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and

for 78 counts of concealment money laundering, in violation of 18 U.S.C.

§ 1956(a)(1)(B)(i).  Gayle challenges the sufficiency of the evidence as to certain

counts.  He also contends that the testimony of Kevin Olson amounted to bad

character evidence.  Finally, Gayle maintains the district court erred in sentencing

him based on a total laundered amount of between $200,000 and $400,000.  After a

thorough review of the record, we AFFIRM.

## I.  BACKGROUND

Gayle was indicted in count one for conspiring with Sabino Rosario, Frank

Rosario, and others, to commit money laundering of drug proceeds from July 2004

through October 2005 in Palm Beach County, Florida.  Counts 2 through 56

involved cash deposits made by Frank Rosario, a heroin dealer, into Gayle's bank

accounts.  Counts 57 to 80 pertained to checks deposited by Gayle into Frank

Rosario's "Didi Services" business account.  After the government voluntarily

dismissed Count 16 at trial, a jury found Gayle guilty of all remaining counts.  The

jury also determined that Gayle should forfeit $310,644 in assets and properties

that were traceable to the money-laundering offenses.

A.  The Trial

Frank Rosario ("Frank") testified at trial that he began helping his older

2

brother, Sabino Rosario ("Sam"), sell heroin in 2000. Frank was best friends with Gayle. Although Gayle never sold heroin, he knew that Frank did. Frank bragged to Gayle about his success in selling heroin and even showed Gayle a hole in his bedroom wall where he had stored thousand-dollar stacks of cash. Gayle, a financial advisor who owned a company called Gayle Financial Services ("GFS"), told Frank he should invest the money instead. Gayle also witnessed Frank bag heroin and give heroin to a street supplier.

Frank eventually asked Gayle to help him legitimize his drug proceeds. In January 2004, Gayle assisted Frank in starting an auto detailing business named Didi Services. Though the business did some legitimate work, mainly for family members, it "ended up being just a front for the heroin business." R3 at 346. Frank believed that the business made just enough lawful income to break even. In order to boost the income, Frank began writing fake invoices and putting drug money into the business account.

Frank and Gayle also concocted a plan to launder Frank's drug money. Frank would deposit cash into Gayle's bank accounts, and Gayle would then deposit bi-monthly $1500 checks from GFS into Didi Services' bank account. The checks from GFS were ostensibly for "marketing and services" but, in reality, Didi Services did no marketing or recruiting of clients for GFS. Id. at 352. The sole

3

purpose of transferring money from Frank to GFS, and then back to Didi Services, was to show income for Didi Services. To avoid suspicion, Frank would use different bank branches to make his cash deposits, sometimes making multiple deposits per day. After Gayle was advised by his bank that Frank had made a single cash deposit exceeding $10,000, thereby triggering notification to the Internal Revenue Service ("IRS"), Gayle cautioned Frank to limit the amount of his deposits. This incident also prompted Frank to vary the bank accounts he used in order to avoid detection. Frank estimated that 85 to 90 percent of his deposits were from drug proceeds. In all, Frank made 55 cash deposits totaling $203,225 into Gayle's bank accounts between July 2004 and October 2005. Frank stated that he received approximately $35,000 to $36,000 back from GFS.

In October 2004, Frank became a partner in GFS pursuant to an oral agreement. Frank then began paying one-third of GFS' overhead costs, which Gayle claimed were $4500 a month. Frank expected a return on his investment in GFS, including $25,000 in profits that Gayle promised him in December 2005, but Frank never received any returns. Frank never had an official job with GFS and never did anything to earn the money GFS returned to Frank through Didi Services.

Didi Services was located next door to Budget Floors, a carpet store run by

Sam. Like Didi Services, Budget Floors made very little legitimate income and was supported primarily by Sam's booming drug business. During 2004 and 2005, Sam earned $60,000 a month as a heroin supplier. Sam paid Gayle, using drug money funneled through Frank, for Gayle's preparation of back taxes owed for the carpet business. Gayle told Sam in a recorded telephone conversation that making his store more successful would "bring [Sam] back into civilization" and take him off of "ghost status," referring to Sam's need to have legitimate credit status. R4 at 621-22, 627-28. Sam also gave Gayle, via Frank, approximately $20,000 in August 2005 to pay off his daughter's car, although Gayle never did so.

Both Sam and Frank invested drug proceeds into properties they jointly purchased with Gayle in a further attempt to legitimize their drug proceeds. These properties included a condominium on Lakeside Drive, for which the Rosarios each contributed $13,000 for the down payment, and a property on B street, for which the Rosarios each contributed $18,000. All of their down payment money came from heroin proceeds. Gayle told Frank that the down payment for the B Street property was $54,000, but it was actually only $18,000. Frank sent Gayle the rental money he collected from the B Street property, and he was supposed to receive ten percent of that income back. Both Frank and Sam paid for improvements to the two properties using drug money, but Gayle did not

5

contribute. Frank also paid for utilities and split the mortgage with Sam and Gayle on the Lakeside condo. Gayle never informed Frank that he later sold the B Street property to Kevin Olson and had pocketed Olson's down payment of approximately $78,500. Similarly, Gayle failed to notify Frank when he sold the Lakeside condo, resulting in a cash payment to Gayle of nearly $63,700.

Kevin Olson testified that he bought the B Street property for approximately $429,900 upon Gayle's advice that it was "undervalued" and "a good deal." R4 at 562-63. The sellers of the property were listed on the closing statement as Ralston and Shirley Swasey. Ralston Swasey is Gayle's step-father and Shirley Swasey is Gayle's mother. Olson had no idea at the time of purchase that Gayle was related to the Swaseys, that Gayle had an ownership interest in the property, or that Gayle had received the cash payment of $78,579.93 that Olson had paid to the Swaseys. Olson had expected to receive rental income through Gayle for the B Street property, but Olson only received $3000. After Olson sued Gayle, Olson learned that Gayle was related to the Swaseys and that the property had been purchased a year earlier for only $320,000. On cross-examination, Olson testified that a judgment was entered against Gayle for the rent payments, though Olson has yet to receive the money.

Federal investigators discovered Gayle's participation in the money

laundering scheme while surveilling Sam's narcotics activities. Recorded phone calls between Sam and Gayle revealed discussions of financial transactions related to the flow of drug money. Investigators also intercepted a call during which Sam told Gayle that Danny Rosario, Sam's brother, had been arrested for selling drugs. When another heroin dealer named Terrell was arrested, Sam likewise informed Gayle. Investigators could find no documents at GFS indicating that GFS had employed Didi Services, Frank, or Sam. They did discover invoices showing that Frank was sending money to GFS, however.

Gayle denied at trial discussing or witnessing any drug-related activity involving the Rosarios. Gayle explained that the bi-monthly $1500 checks to Didi Services were to pay for client referral fees and Frank's services as the manager of the Lakeside condo and B Street property, rather than to launder money. Gayle also claimed he was unaware that Frank was making all deposits to him in cash. Although Gayle discussed co-investing in properties with Frank and Sam, Gayle said he ultimately purchased the Lakeside property by himself and the B Street property with his parents. Gayle testified that his parents intended to reside at the B Street property and rent out one of the bedrooms. Gayle admitted selling the B Street property to Kevin Olson and collecting rent from the property, but he stated that he could not disperse the rental income because of the ongoing money-

7

laundering investigation.

B. Sentencing

The initial presentence investigation report ("PSI") set Gayle's base offense level at 22, premised on Gayle's laundering of funds between $400,000 and $1,000,000. Gayle filed a written objection to this amount, noting that the jury's forfeiture verdict was for $310,644. Based on Gayle's calculations, the total amount of laundered funds fell between $200,000 to $400,000, which corresponded to a base offense level of 20.

During sentencing, the government argued that the total laundered amount was $401,000 based on the tainted rental income and personal cash exchanges between Frank Rosario and Gayle. Gayle replied, "I stand on . . . my written pleading." R9 at 16. Gayle then added that, because the government's proposed amount was only $1,000 over the threshold for that level, and because the evidence supported a finding that $219,000 was laundered, the "safe bet" was to sentence Gayle according to the amount of more than $200,000 but not more than $400,000. Id. at 16-17, 19. The district court adopted Gayle's request and decreased his base offense level to 20. The court ultimately sentenced Gayle within his guidelines range[1] to concurrent terms of 120 months of imprisonment on each count and 3

_____

[1] Based on Gayle's total offense level and criminal history category, his guidelines range was 108 to 135 months of imprisonment.

8

years of supervised release.

## II. DISCUSSION

A.  Sufficiency of the Evidence

Gayle argues that there was insufficient evidence to convict him of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), as charged in counts 2 through 56 (excluding count 16).[2]  These counts pertained to the cash deposits Frank Rosario made into Gayle's bank accounts.  Gayle contends the evidence only showed that he stole, not laundered, the drug money.

We review de novo the sufficiency of the evidence to support a conviction. United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008).  Although the jury has leeway to choose between the reasonable conclusions the evidence at trial may establish, "we do not enjoy the same freedom.  We must accept all reasonable inferences . . . made by the jury."  Id. at 1010 (quotation marks and citation omitted).  In addition, we must view the evidence, including all credibility choices by the jury, in the light most favorable to the government.  See id. at 992.

In order to convict Gayle of money laundering under 18 U.S.C.

---

[2] Gayle does not challenge the sufficiency of the evidence as to count one, the conspiracy count, or counts 57 through 80.  He has therefore abandoned any claims concerning the sufficiency of the evidence with respect to those counts.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam) ("When an appellant fails to offer argument on an issue, that issue is abandoned.").

§ 1956(a)(1)(B)(i), the government had to prove beyond a reasonable doubt that:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

United States v. Miles, 290 F.3d 1341, 1355 (11th Cir. 2002) (per curiam). As defined by § 1956(c), a "transaction" includes a deposit to a financial institution. 18 U.S.C. § 1956(c)(3). A person "conducts" a financial transaction by "initiating, concluding, or participating in initiating, or concluding a transaction[.]" Id. § 1956(c)(2). Evidence of concealment includes "unusual secrecy surrounding the transaction" and "structuring the transaction in a way to avoid attention." Miles, 290 F.3d at 1356 (quotation marks, citation, and bracket omitted).

Gayle does not specify on appeal which of these four elements are absent, and our review of the record reveals sufficient evidence as to each element. Specifically, the evidence establishes that Gayle initiated and participated in a scheme wherein Frank deposited drug-related proceeds into Gayle's bank accounts, and Gayle redeposited that money back into Frank's business account. There is ample evidence, which Gayle does not contest on appeal, that Gayle knew the deposited funds were from Frank and Sam's heroin dealings. Gayle also structured the transactions so as to avoid attention by having Frank use multiple branches and

10

bank accounts to make his deposits. Gayle further advised Frank to limit the amount of his deposits to avoid being red-flagged by the IRS. There was thus sufficient evidence that Gayle acted to conceal the illegal origin of the proceeds by disguising them as legitimate business transactions. Contrary to Gayle's argument, there is no statutory requirement that Gayle must have returned all of the drug-related money in order to have laundered it. Accordingly, we find more than sufficient evidence to support Gayle's challenged convictions for money laundering under § 1956(a)(1)(B)(i).

## B. Bad Character Evidence

Gayle contends that Kevin Olson's testimony about his purchase of the B Street property was irrelevant to the money laundering charges and served no purpose except to prove Gayle's bad character. As such, Gayle contends Olson's testimony was inadmissible under Rule 404(b). The government counters that Rule 404 does not apply because Olson's testimony was not extrinsic character evidence, but rather evidence of Gayle's conduct that was inextricably related to the charged offenses. We agree with the latter.

We review a district court's admission of other crimes or bad acts under Rule 404 for abuse of discretion. See United States v. Lamons, 532 F.3d 1251, 1265 n.26 (11th Cir. 2008). Rule 404(b) excludes extrinsic evidence of uncharged

11

acts as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be *admissible for other purposes, such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b) (emphasis added). However, evidence is not extrinsic to the charged offense, and thus does not fall within Rule 404(b)'s ambit, if the bad act "arose out of the same transaction or series of transactions as the charged offense," the evidence is "necessary to complete the story of the crime," or the evidence is "inextricably intertwined with the evidence regarding the charged offense." United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation marks and citation omitted). Such evidence is admissible if it explains the context or set-up of the crime, and is linked in time and circumstances with the crime. See id. Regardless of whether such evidence falls inside or outside the scope of Rule 404(b), the evidence must still comport with Rule 403's requirements that its probative value outweighs the danger of unfair prejudice. See id.

In this case, Olson's testimony was relevant and integral to flushing out Gayle's criminal acts of money laundering. According to Frank and Sam, Gayle persuaded them to invest their money in properties in order to legitimize their drug proceeds. However, at trial Gayle denied using Frank and Sam's drug money to

12

purchase the B Street property. Gayle instead claimed that he bought the property with his parents for them to live in and to earn rental income. Olson's testimony was necessary to show that Gayle sold the B Street property under his parents' names to Olson, without telling Frank or Sam, and then retained the entire proceeds from the sale unbeknownst to Frank, Sam, or Olson. The fact that Gayle deceived Olson concerning the ownership of the property refuted Gayle's defense that he and his parents had bought the property for a legitimate purpose. Olson's testimony was thus relevant to the charges of money laundering because it reflected Gayle's active concealment of the tainted funds used to purchase the property, and it showed the trail of the Rosarios' drug money. Additionally, Olson's testimony that Gayle withheld rental income due him, just as Gayle had done with the Rosario brothers, was relevant to show that Gayle was continuing to usurp any money gained from the property and that Gayle made profits using the tainted funds. Because the evidence formed "an integral and natural part of an account of the crime," the evidence fell outside the scope of Rule 404(b) and was properly admitted by the district court. Id. at 1346 (concluding that witness' testimony that the defendant threatened to kill her if she did not return his deposit was an integral part of how the defendant laundered those funds).

Further, the probative value of Olson's testimony was not substantially

13

outweighed by a danger of unfair prejudice. We have said that "Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." Id. at 1344 n.8 (quotation marks, citation, and brackets omitted). Viewing the evidence in the light most favorable to its admission, and considering the overwhelming evidence of Gayle's guilt, we find no abuse of discretion in its admission. See id. at 1346 ("[I]t is doubtful that this testimony caused any *unfair* prejudice considering the overwhelming evidence of Edouard's guilt.")

C. Sentencing Guidelines

Gayle asserts the district court erred in finding that Gayle was responsible for laundering an amount of more than $200,000 but not more than $400,000. He submits that the only funds laundered were the bi-monthly $1500 payments to Frank and a $5000 cash payment that Frank gave Gayle to reimburse him for a car payment. Consequently, Gayle calculates that the total amount of laundered money was approximately $40,000, which would have changed his Sentencing Guidelines computation. The government responds that Gayle invited any error by requesting the district court to sentence him based on the amount of $200,000 to $400,000. We agree with the government that the invited error doctrine precludes this issue from review.

14

"The doctrine of invited error is implicated when a party induces or invites the district court into making an error." United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (quotation marks and citation omitted). A party who invites an error may not later challenge that error on appeal. See id. Furthermore, we are precluded from reviewing an invited error or invoking the plain error rule and reversing. See id. at 1327, 1337 (concluding that the defendant invited the claimed error in the jury instructions by expressly accepting them, and he thereby waived his right to challenge those instructions).

Here, the record reflects that the government attempted during sentencing to persuade the district court that Gayle should be responsible for a total laundered amount of over $400,000. Gayle, in response, urged the court to find against the government's position and sentence him according to the amount of more than $200,000 but not more than $400,000. Accordingly, because Gayle invited any error resulting from the district court's adoption of his proposed laundered amount, we are precluded from reviewing the alleged error. See id.

## III. CONCLUSION

For the reasons stated herein, we AFFIRM Gayle's convictions and sentences.

**AFFIRMED.**

15