[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 10, 2010
JOHN LEY
CLERK

_____

No. 08-14534

_____

D. C. Docket No. 05-00621-CR-01-CAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANGELA DEE ISLEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 10, 2010)

Before DUBINA and TJOFLAT, Circuit Judges, and BOWEN,[*] District Judge.

PER CURIAM:

A jury convicted Angela Dee Isley on fourteen counts relating to a scheme

_____

[*] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

to defraud the Medicare program, in violation of 18 U.S.C. § 1347; thirty-five counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346; and three counts of money laundering, in violation of 18 U.S.C. § 1957. Isley appeals her convictions. For the reasons set forth below, we affirm the judgment of the district court.

## I. BACKGROUND

*A.    Facts and Pre-Trial Proceedings*

Angela Denise Isley was hired by Orthoscript, Inc., a durable medical equipment ("DME") supply company[1] located in Alpharetta, Georgia, to manage its billing operations, which included the supervision and instruction of other employees who prepared and submitted claims for payment to insurance companies and Medicare.[2] Under the Medicare program, Orthoscript submitted its claims for reimbursement to a Medicare contractor known as a DME Regional Carrier ("DMERC"). In the southeast region (Region C),[3] the DMERC was Palmetto Government Benefits Administrators ("Palmetto"), which processed and

---

[1] Specifically, Orthoscript sold orthopedic supplies such as arm slings, wrist splints, and walking boots to patients through their physicians in the southeast region of the United States. Once a physician prescribed and dispensed the supplies, Orthoscript filed claims for payment to insurance companies and Medicare.

[2] Isley was also a shareholder in the company.

[3] There are three other regions in the United States.

adjudicated Medicare claims from Orthoscript and other DME suppliers in the region.

The Medicare program used a coding system called the Healthcare Common Procedure Coding System ("HCPCS"), under which the DME items were assigned product codes. When Orthoscript submitted a claim form to request Medicare payment, it was required to accurately identify the actual products dispensed to the patient by using the proper product code. To help the suppliers, Palmetto published a Supplier Manual and other advisories, setting forth Medicare's rules for submitting claims, and it employed nurse educators to answer coding questions. Additionally, another Medicare contractor, the Statistical Analysis DME Regional Carrier ("SADMERC"), operated a coding help line and website to assist suppliers to correctly code their products on Medicare claim forms.

Isley was first indicted on December 29, 2005, along with the owner and CEO of Orthoscript, James Arch Nelson, on thirty-one counts of Medicare fraud; specifically, they were charged with knowingly and willfully assigning incorrect product codes to certain orthopedic supplies in order to generate higher payments from Medicare than were authorized.[4] In other words, the Government charged that Isley and Nelson exectued a scheme to file Medicare claims and receive

_____

[4] Isley and Nelson were also indicted on six counts of fraud against the Federal Employee Health Benefit Program, a federally funded health care benefit program for federal employees.

payment for DME products that were not equivalent to the products actually supplied to the patients. This alleged scheme to defraud Medicare took place from January 1, 1999 to November 30, 2003.

On February 9, 2006, Isley filed a <u>Brady</u> motion[5] requesting that the Government produce, for the relevant time period, all medical necessity reviews of claims submitted to Palmetto by Orthoscript and other Region C DME suppliers for the DME product codes at issue in the indictment. Palmetto, as the DMERC, would at times subject a benefits claim to a medical necessity review, asking the DME supplier for detailed information about its claim, including the manufacturer's picture and description of the item, the manufacturer's invoice, and the physician's medical necessity letter and treatment notes. After this review, the DMERC would approve or deny payment. The DMERC's approval of a claim after a medical necessity review is called an "MNA" (for Medical Necessity Approval).[6] According to Isley, the MNAs for the product codes at issue in the indictment would show that the DMERC's use of the codes was ambiguous, confusing, and misleading. This, in turn, would show Isley's use of the codes to be

_____

[5] <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), "places an affirmative duty upon the [government] to reveal any 'material' evidence in its possession that would tend to exculpate a defendant." <u>Breedlove v. Moore</u>, 279 F.3d 952, 961 (11th Cir. 2002).

[6] The majority of benefits claims were processed by the DMERC automatically, that is, without a medical necessity review. If a benefits claim was denied, a DME supplier could appeal. The review of claims on appeal, however, was not as detailed as a medical necessity review.

reasonable and indeed expressly sanctioned by the DMERC. According to Isley, the MNAs were necessary to show that she lacked the requisite *mens rea* to commit fraud and that she was entitled to the defense of entrapment-by-estoppel.

The magistrate judge orally granted this motion for production of <u>Brady</u> material at a hearing in February 2006. This ruling was later reversed in part by written order upon the magistrate judge's conclusion that MNA information pertaining to <u>other DME suppliers</u> was not exculpatory and therefore need not be produced to Isley. Isley appealed, and after oral argument, the district court affirmed this ruling by Order dated September 1, 2006.

After the issuance of this ruling, Isley filed a Freedom of Information Act request to Palmetto, seeking its MNAs of all DME suppliers for all product codes in the indictment. Isley sent this same request to the DMERCs in the three other regions as well. When months passed without response, Isley filed an *ex parte* motion for the issuance of subpoenas *duces tecum*, through which she requested subpoenas issued to the four DMERCs for the production of MNA information as it related to the claims of all DME suppliers from January 1, 1999 to November 30, 2003 for the product codes at issue in the indictment.

While this motion was pending, the Government filed a superseding indictment on February 20, 2007. Nelson was not named in the superseding indictment; he had pled guilty on a lesser charge and agreed to testify against Isley.

5

The superseding indictment charged Isley with 14 counts of health care fraud against Medicare and did not contain some of the product codes at issue in the original indictment.[7]  These charges involved a time period from January 2001 to December 2003.   The superseding indictment added 36 counts of honest services mail fraud,[8] in which Isley was charged with using her position of control over the finances of Orthoscript to misappropriate Orthoscript funds.  Specifically, Isley wrote checks drawn upon Orthoscript's bank account to pay her personal expenses charged on her personal credit card.[9]  Finally, the superseding indictment added three counts of money laundering related to the funds she criminally derived from the healthcare fraud.

With respect to Isley's motion for the issuance of subpoenas *duces tecum*, the Government argued that Isley had not shown that she had personal knowledge during the relevant time period of how other DME suppliers were billing their products or that she reasonably relied upon the other companies' MNAs.  Further, Isley had not presented any evidence that she herself was confused about the

---

[7] The superseding indictment did not contain charges of fraud against the Federal Employee Health Benefit Program either.

[8] The Government dismissed Count Twenty during the trial.

[9] The Government had previously announced its intention to present these same allegations as inextricably intertwined, or alternatively, as Rule 404(b) evidence.  According to the Government, the evidence of her misappropriation established a motive for Isley to increase the payments made to Orthoscript from Medicare.

coding standards.[10]  Despite these protestations and an earlier ruling that such information was not exculpatory, the district court allowed the issuance of the subpoenas on March 6, 2007.  The return date for the production of documents responsive to the subpoenas was April 30, 2007.  On that date, the Government filed motions to quash the subpoenas.  The matter came before the district court for oral argument on June 25, 2007.

At oral argument, Isley argued that MNA information from all four regions was necessary because she relied upon the approvals to inform her decisions with respect to coding and because the evidence could be used to impeach government witnesses who testify that the coding she used was clearly wrong.  The United States Attorney's Office and the non-party governmental DMERC agencies argued that the evidence was irrelevant and non-exculpatory.  The district court heard about certain confusion among the various agencies respecting where and in what form the records were housed, as well as how difficult and expensive the production of documents would be.  In the end, the district court agreed with Isley that the evidence may be <u>Brady</u> material and placed the burden of producing the information upon the government.[11]  Consequently, the district court directed the

---

[10]  The Government made these same arguments in moving in limine to exclude evidence of other DME suppliers' Medicare billing practices and experiences with Medicare claims reviews.

[11]  The district court stated:

7

Government to produce the MNA information of all providers for the relevant codes only from Region C as a "sample" to determine whether the evidence was exculpatory. Following this production, the court ruled that while the evidence may be "relevant to some of the defendant's possible defenses," the burden and cost of requiring the Government to produce the other regions' MNAs outweighed Isley's need for such cumulative information.

B.      *Trial of the Case*

The ten-day trial of the case began with jury selection on April 14, 2008. The Government explained Isley's Medicare fraud as a scheme to seek reimbursement for expensive, custom-fabricated medical equipment (specifically, wrist braces and walking boots) when the cheaper, pre-fabricated items had actually been provided to patients. Pre-fabricated items are manufactured in bulk for off-the-shelf distribution without a specific patient in mind. Pre-fabricated items could be trimmed, molded, bent or otherwise modified for use by a specific patient; however, this makes the item custom-fitted not custom-fabricated.

---

I'll be frank with you. It's absolutely inconceivable to me that the government's allowing these Medicare provider contractors, whatever they are, to run without keeping any better records that can be searched than there are. Now, I'm not going to try to sort out whether the people here today are telling the truth, or the people behind them are giving them false information or not. It's real simple for me. I can turn the thing right back on its head and say I think it's Brady material, and the government can start sorting through the boxes, and get it here, and you can sort out who's who, and who's got what, and when they did it, and whether they turned over the boxes and not the electronic data or whatever.

(Tr. of Hrg. on June 25, 2007, at 105, R. on App. 212.)

Custom-fabricated items are molded or created specifically for an individual patient. The indictment charges that on ten occasions (Counts One through Ten), Isley billed Medicare for wrist braces using the custom-fabricated code of either L3800 or L3907. It further charges that on four occasions (Counts Eleven through Fourteen), Isley billed Medicare for walking boots using the custom-fabricated code of L1960. With respect to all fourteen counts, the Government charged that Isley's use of these codes was fraudulent because the actual products dispensed were pre-fabricated.

At trial, Isley had at her disposal all of the documents relating to the MNAs from Region C for the product codes at issue in the indictment (L3800, L3907, and L1960) as well as the other product codes that were no longer at issue in the case. She did not, however, have any MNAs from the other three regions. Isley believed that, as evidenced by the MNAs, Medicare erroneously approved the use of custom-fabricated codes for pre-fabricated products. Isley had maintained throughout the pre-trial proceedings that the MNAs were relevant Brady material because she had relied upon them in making her own coding decisions. The evidence at trial, however, belied this assertion.

Sandra Sosebee, who worked in the billing department at Orthoscript, testified that she informed Isley on numerous occasions that the use of product code L3907 for pre-fabricated wrist braces was incorrect. Isley explained that she

9

believed this custom-fabricated code could be used if a pre-fabricated wrist brace was bent or molded to fit the patient. This matter was often discussed at manager meetings, wherein Isley persisted with her belief that a bent or molded pre-fabricated item could be billed using a custom-fabricated code. When Sosebee expressed her concern that Medicare would not agree with this coding, Isley responded: "Well, Medicare is stupid. I will deal with them when they come in here." Sosebee testified that Isley never told her that she could rely on a prior paid claim in making a coding decision.

On April 12, 2004, Sosebee wrote to Isley, via e-mail, again questioning the use of certain wrist brace codes. Sosebee suggested that prior paid claims could inform the decision of what code should be used. In response, Isley wrote:

> I would be hesitant to make any assumptions as to what Medicare is telling us. We have concluded in the past that Medicare is not consistent with regards to what they try to relay to us. I would not make the leap that if Medicare made a payment that means it's correct and if they didn't make a payment it is incorrect.

Another billing department employee of Orthoscript, Victoria Meguiar, similarly testified that Isley looked at the fee schedule and the rate of reimbursement in determining what code should be used. Further, while Meguiar showed Isley letters indicating that Orthoscript's billing codes were incorrect, Isley, in turn, never showed Meguiar MNAs indicating that the billing codes were correct. Meguiar was convinced that Orthoscript was coding certain products

10

incorrectly, and she set about trying to prove to Isley, through phone calls to the DMERC, that Isley's understanding of pre-fabricated versus custom-fabricated product codes was incorrect.[12] In fact, on one occasion, Meguiar changed the billing codes for wrist splints to a pre-fabricated code, which lowered the reimbursement rate. Isley confronted Meguiar and instructed her not to change the codes again.

Melissa Carnes, who also worked in the billing department of Orthoscript, testified that she was present during the meeting about custom-fabricated versus pre-fabricated billing codes when Isley stated that Medicare is "stupid." Carnes further testified that no one else at Orthoscript shared Isley's viewpoint on the use of a custom-fabricated code for pre-fabricated items that were simply bent or molded to fit a patient.[13]

Additionally, Sosebee, Meguiar, and Carnes all testified that the only document to which Isley referred in their discussions of using the proper product code was the Medicare fee schedule, which gave the rate of reimbursement for each product code. In fact, Carnes stated that Isley told her Orthoscript could not afford to use the pre-fabricated codes that Carnes wanted to use for certain items.

---

[12] Meguiar testified that Isley wanted proof in "black and white" that Orthoscript was billing incorrectly.

[13] Of note, Isley conceded on cross-examination that she had no way of knowing whether a doctor actually bent or molded a product to fit a patient once it is taken out of its box.

Finally, James Arch Nelson testified that Orthoscript employees came to him when they became frustrated with Isley's use of incorrect billing codes. He attended a meeting between Isley and the employees, during which Isley explained her position on the billing codes; Isley did not, however, refer to any MNAs to support her position. Nevertheless, Nelson "sided with" Isley on the coding issue even though it appeared to him that the other employees were right and that Orthoscript was coding pre-fabricated products incorrectly.

During the course of the trial, Isley used the DMERC's treatment of product codes not charged in the superseding indictment to demonstrate confusion in the industry. For instance, Orthoscript had coded certain walking boots with L2114 and L2116 codes.[14] Orthoscript had received several MNAs for its claims that used the L2114 and L2116 product codes; thus, Isley relied upon the MNAs in using these codes. Subsequently, however, Orthoscript received both approvals and denials for the same products coded with the L2114 and L2116 codes. The confusion in the use of these codes led to an industry-wide review by the DMERC of the L2114 and L2116 codes.

Despite the confusion over the use of the L2114 and L2116 codes, witnesses aside from Isley testified that there was no industry confusion regarding

_____

[14] The use of the L2114 and L2116 product codes had been charged in the original indictment but were not included in the superseding indictment.

12

Medicare's definitions for custom-fabricated versus pre-fabricated products. Cathy Plunkett, an experienced health care consultant, testified that the definitions were "clear." Missy Carnes, Vicky Meguiar, and Sandra Sosebee testified that they were not confused by the definitions. Further, Isley herself testified that a DME supplier could not use a custom-fabricated code if the doctor provided a pre-fabricated item to a patient; Orthoscript supplied only pre-fabricated wrist splints and walking boots to doctors' offices.

Nevertheless, Isley maintained at trial that she relied upon the MNAs from Region C as well as the other regions in the country to inform her decision on how to code the products. The district court permitted Isley to testify about her futile efforts to obtain the MNAs from Regions A, B, and D; moreover, Isley testified that even though she did not get physical possession of the MNAs, Region A had reported the existence of approximately 2000 MNAs, Region B had reported 812 MNAs, and Region D had reported between 1500 and 2500 MNAs.[15]

On cross-examination, however, Isley admitted that, with respect to seven of the ten charges related to wrist braces, she could not have relied upon any MNAs

_____

[15] In considering the number of MNAs that existed in the other regions, it is important to note that Isley had requested six different DME product codes, only three of which were charged in the indictment. She requested and received the MNAs in Region C for the same six product codes. It became apparent at trial, however, that a great majority of the MNAs from Region C related to the uncharged product codes. Isley only speculates that the MNAs from the other regions would not have a proportionate share of irrelevant MNAs, that is, MNAs unrelated to the product codes charged in the indictment.

13

when filing Orthoscript's claims because there were no MNAs for the relevant product codes during the time that she had submitted the claims. With respect to the later filed wrist brace claims, Isley admitted that she did not see any MNAs related to the same product code until she reviewed discovery material in the case in 2007. With respect to the walking boot code, L1960, Isley's testimony of reliance was refuted by Special Agent Erica Wilker's testimony on rebuttal that for the relevant time period, Region C did not perform a medical necessity review of Orthoscript's claims using product code L1960.[16]

In short, Isley attempted, through MNAs from Region C, to paint a picture of confusion and ambiguity on behalf of the DMERC in the way that it processed claims involving the subject DME product codes. Yet, the only confusion shown related to uncharged product codes. Moreover, Isley presented no evidence, other than her own testimony, that she relied upon any MNA in determining what codes to utilize. Rather, the evidence presented at trial, as outlined above, directly refuted her assertion of reliance.

C.    *Post-Trial Motion*

On May 2, 2008, Isley filed a motion for a new trial based upon an alleged

---

[16]  In reviewing the three documents that Isley claimed to be MNAs from Orthoscript for product code L1960, Wilker testified that one was not for code L1960, that one was an appeal rather than an MNA, and that there was no evidence that the third was received and reviewed by Palmetto.

Brady violation in that the Government failed to produce the MNAs from Regions

A, B, and D.  In this motion, Isley again argues that these MNAs were material to

her defense that she relied upon the DMERC's regular approval of using the same

DME product code for the same product as those criminalized in the indictment.

The district court denied the motion, ruling as follows:

> Now, having the benefit of the evidence at trial, the court
> concludes that the only use the defendant could have made of the
> additional medical necessity approvals would be impeachment.  This
> is so because the evidence established that the defendant did not rely
> on these medical necessity approvals to make her own coding
> decisions.

(Order of August 8, 2008, at 2, R. on App. 280.)  In considering whether the other

regions' MNAs should have been produced for impeachment purposes, the district

court ruled that failure to produce cumulative impeachment evidence does not

constitute a Brady violation.

D.     Isley's Appeal

On August 8, 2008, Isley filed a timely notice of appeal, in which she asserts

the following errors.  First, she argues the district court abused its discretion in

denying her motion for new trial based upon the alleged Brady violation.  She next

argues that the district court erred in failing to give an "entrapment-by-estoppel"

instruction and in failing to give an "interpretive rules" instruction to the jury.

Finally, Isley argues that the district court erred by admitting evidence that Isley

15

made contributions to the Atlanta Lesbian Center and that she had an affair.

## II. DISCUSSION

*A.      The Claimed* Brady *Violation*

In this case, Isley argues that the Government violated Brady v. Maryland,

373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide the

MNAs from Region A, B, and D.  We review the district court's denial of a motion

for new trial based on a Brady violation for abuse of discretion.  United States v.

Vallejo, 297 F.3d 1154, 1163 (11th Cir. 2002).  Under Brady, the Government

violates the Due Process Clause if it suppresses evidence favorable to the accused

when the evidence "is material either to guilt or to punishment."  Brady, 373 U.S.

at 87, 83 S. Ct. at 1197.  Evidence favorable to the accused includes impeachment

evidence.  United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87

L.Ed.2d 481 (1985).  To obtain a new trial based upon a Brady violation, a

defendant must show:

> (1) the government possessed favorable evidence to the defendant; (2)
> the defendant does not possess the evidence and could not obtain the
> evidence with any reasonable diligence; (3) the prosecution
> suppressed the favorable evidence; and (4) had the evidence been
> disclosed to the defendant, there is a reasonable probability that the
> outcome would have been different.

Vallejo, 297 F.3d at 1164.

16

We cannot say that the district court abused its discretion here because Isley cannot show that had she obtained the MNAs from other regions, the outcome of her trial would have been different. This is because the evidence failed to establish that she relied upon any MNA in making the coding decisions charged in the indictment. While she testified at trial that she told Orthoscript employees that the MNAs were her "trump card" with Medicare, the employees testified that she never mentioned MNAs in explaining her coding decisions. Further, the evidence showed that she could not have relied upon MNAs for most of the charged coding decisions because no pertinent MNAs existed at the time Medicare was billed. Isley also testified that she did not see the other relevant MNAs until she reviewed the discovery material years after she made the coding decision. Thus, even assuming that there exists MNAs relevant to the subject codes in the other regions at the time Isley made her coding decisions, the jury rejected the notion that she relied upon them.

To the extent that Isley sought a new trial based upon the impeachment value of the MNAs from other regions, her argument similarly fails. Isley believed that the other MNAs would impeach the Government witnesses by demonstrating confusion and ambiguity in the application of the billing codes to the subject products. Even if she could show confusion in the industry, Isley did not demonstrate that any such confusion affected her decisions because she did not rely

17

upon the coding decisions in the industry.

Moreover, the district court determination that this impeachment evidence was cumulative was not erroneous. At trial, Isley was able to show that some errors had occurred in the medical necessity review process. Indeed, a large portion of her defense focused on the confusing and misleading application of the L2114 and L2116 codes for walking boots. Isley was therefore able to show that the DMERC was not always consistent. However, evidence of this nature from other regions would be merely cumulative.

In short, the MNAs from other regions are not material, i.e., if the MNAs had been admitted at trial in Isley's favor, there is not a reasonable probability of a different outcome in this case. The district court therefore did not abuse its discretion in denying Isley's motion for a new trial.[17]

B.     *Jury Instructions*

We review the district court's refusal to give a requested jury instruction for an abuse of discretion. United States v. Moore, 525 F.3d 1033, 1046 (11th Cir. 2008). The denial of a requested instruction is reversible error if (1) the requested

---

[17] We note that it is inconceivable that a district court could determine prior to trial that evidence would be merely cumulative when the court has not seen or does not know the exact nature of the evidence. Nevertheless, the district court's post-trial conclusion in this case that the MNAs from other regions were only cumulative impeachment evidence is not erroneous, as explained above. Thus, any error conceivably committed by the district court prior to trial does not warrant reversal of Isley's conviction.

instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense. United States v. Richardson, 532 F.3d 1279, 1289 (11th Cir. 2008).

Isley requested an entrapment-by-estoppel instruction. "Entrapment-by-estoppel is an affirmative defense that provides a narrow exception to the general rule that ignorance of the law is no defense." United States v. Funches, 135 F.3d 1405, 1407 (11th Cir. 1998), quoted in United States v. Eaton, 179 F.3d 1328, 1332 (11th Cir. 1999). Entrapment-by-estoppel applies "when a government official erroneously tells a defendant that conduct is legal and the defendant, believing the official, acts on the advice." United States v. Billue, 994 F.2d 1562, 1568 (11th Cir. 1993). This defense is not available unless a defendant can show that she relied upon an official government communication before acting in a manner proscribed by law. United States v. Johnson, 139 F.3d 1359, 1365 (11th Cir. 1998).

Isley contends that an entrapment-by-estoppel defense is supported by her reliance upon the MNAs Palmetto sent to Orthoscript. That is, through the MNAs, Palmetto advised her that her coding choices were correct.

We first note that Isley cannot point to a single statement or communication

19

to her personally upon which she relied to make her coding decisions.[18] Rather, she suggests that approvals of prior claims equated to affirmative statements upon which she could rely in coding the fourteen subject claims of the indictment.[19] To the extent that there were misstatements through the MNAs about which product codes were acceptable, unless these statements were made directly to Isley, her reliance upon them is misplaced. See Eaton, 179 F.3d at 1332 ("For a statement to trigger an entrapment-by-estoppel defense, it must be made directly to the defendant, not to others.")

Moreover, the evidence at trial established that there was no confusion in the industry: pre-fabricated products could not be coded with custom-fabricated codes. Thus, even assuming Isley relied upon an erroneous MNA, such reliance would not be objectively reasonable.[20] Thus, the district court did not abuse its discretion in refusing to give the entrapment-by-estoppel charge.

---

[18] Isley only points to a single phone call she personally made to Roberta Riddle, a nurse educator with Palmetto, the DMERC. According to Isley, Riddle told her that she need only match the doctor's diagnosis code to the HCPCS product code in order for the selected code to be proper. Other than the fact that Riddle and other employees privy to the telephone call deny that Riddle made such a statement, the cross-coder lists several possible HCPCS codes for every diagnosis code. A simple "match" is not possible. Moreover, Isley conceded that the cross-coder was but a factor in determining the proper product code. Accordingly, Riddle's advice to use the cross-coder is not an affirmative statement supporting an entrapment-by-estoppel defense.

[19] Isley refers to *Orthoscript's* reliance upon the MNAs Palmetto issued to *Orthoscript* rather than any statement made to her personally upon which she relied.

[20] As noted above, Isley did not show at trial that she relied upon any MNA in making her coding decisions.

Isley also requested the following "Interpretative Rules" charge:

> You have heard the testimony during the case of Palmetto's interpretations of various HCPCS (Healthcare Common Procedure Coding System) product codes for wrist splints and walking boots. The rules and regulations that have been mentioned during this trial are what is known as "interpretative" rules and regulations. They were not promulgated pursuant to the notice-and-comment requirements of the Administrative Procedure Act. You are hereby instructed that "interpretative" rules and regulations lack the force and effect of law. As such, they are non-binding, and do not foreclose alternative courses of action by durable medical equipment (DME) providers.

Isley refers to the supplier manual and advisories issued by the DMERC and SADMERC as the interpretative rules upon which the Government relied. Isley contends that she was prosecuted under definitions of custom-fabricated and pre-fabricated set forth in these documents; thus, the above charge was appropriate.

The district court did not abuse its discretion in refusing to give this charge because Isley was not indicted for violating an interpretative Medicare rule. Rather, she was charged with defrauding the Medicare program in violation of 18 U.S.C. § 1347. Isley knew that using custom-fabricated codes for pre-fabricated products would cause Medicare to pay a higher rate for custom-fabricated products.[21] This conduct of intentionally manipulating the Medicare program is

---

[21] By way of example, the evidence relating to count four of the superseding indictment shows the following. Orthoscript was a stock and bill operation, which means that it would stock and charge physicians for a supply of DME products, and once a physician dispensed a product, Orthoscript would obtain the prescription form and bill Medicare for reimbursement. With respect to count four, Orthoscript supplied several wrist braces to a physician's office at a

made criminal by the Medicare fraud statutes, not the interpretative rules and regulations. The interpretative rules to which Isley refers are relevant only because they inform the jury on the question of whether the claims to Medicare were false. In any event, the district court gave an "intent" instruction which substantially covered the proposed charge.[22]

## C. Admission of Extrinsic Evidence

On January 25, 2007, prior to the superseding indictment, the Government filed a Rule 404(b) notice of its intent to introduce evidence that Isley had used Orthoscript funds without permission to pay for unauthorized personal charges on her corporate American Express account, including a $20,000 charitable donation to the Atlanta Lesbian Center. The Government also included notice of its intent to introduce evidence that Isley used Orthoscript funds without permission to pay for charges on her personal Capital One credit card accounts. In response thereto, Isley filed a motion to suppress, arguing that the Government was attempting to inject her sexual orientation into the trial improperly.

_____

charge of $4.10 each. Yet, when one of these wrist braces was prescribed to Patient E.A., Orthoscript submitted a claim to Medicare for $100. (See Gov't Ex. 4A - 4G.)

[22] The "intent" instruction given was as follows:

A statement or claim is not knowingly and willfully false if it is the subject of a disputed legal question or if it represents a reasonable interpretation of applicable rules or regulations. In this regard, the government has the burden of proof beyond a reasonable doubt that Ms. Isley's statements or claims were not a reasonable interpretation of any applicable codes, rules or regulations.

In the superseding indictment, the Government charged Isley with 36 counts of honest services mail fraud relating to her use of Orthoscript funds for the payment of charges on the personal Capital One accounts of Isley and her significant other, Tracy Hollis. The personal credit card charges against her corporate American Express card, such as the charitable contribution, were not charged in the superseding indictment. In denying Isley's motion to suppress the unindicted credit card transactions, the district court ruled that the charitable donation evidence was admissible either as inextricably intertwined with the mail fraud counts or relevant 404(b) evidence.

At trial, the Government called Hollis to testify about the two Capital One credits cards that were the subject of the mail fraud charges. During direct examination, the Government asked Hollis questions about her relationship with Isley:

> Q:  Approximately how long were you involved in a relationship with Ms. Isley?
>
> A:  About nine and a half years.
>
> . . . .
>
> Q:  And when did the relationship end?
>
> A:  In June of 2004.
>
> Q:  All right. I'm not going to go into it in great detail, just briefly, can you tell the jury the nature of how the relationship ended?

A:     [Isley] was having an affair.

. . . .

Q:     Would you describe [your subsequent contacts with Isley] to be
       hostile, or amicable, or how would you describe it?

A:     It was painful, difficult, but civil.

Isley did not object to this testimony.

On appeal, Isley objects to Hollis's testimony that Isley had an affair and to

the admission of evidence that she made a $20,000 donation to the Atlanta Lesbian

Center.[23]

1.     Hollis Testimony

Because Isley did not contemporaneously object to this testimony, we

review its admission for plain error only.  United States v. Munoz, 430 F.3d 1357,

1375 (11th Cir. 2005).  Under the plain error review standard, a defendant must

show (1) error, (2) that is plain and (3) that affects a defendant's substantial rights.

United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2008).  To affect her

substantial rights, Isley must show the admission of this evidence affected the

---

[23]  During voir dire, defense counsel informed the venire that Isley is gay and asked
whether any venire member had feelings one way or another about gay people that would affect
their impartiality as jurors.  On appeal, the Government argues that Isley cannot be prejudiced by
the admission of the extrinsic evidence challenged here because she first injected her sexual
orientation into the trial of the case.  Because Isley knew during voir dire, however, that the
district court was going to allow evidence of her donation to the Atlanta Lesbian Center, she was
entitled to qualify the venire on the issue as a matter of trial strategy.  Thus, any argument that
Isley somehow waived her objection to this evidence during voir dire is without merit.

24

outcome of the proceedings. <u>United States v. Parker</u>, 277 Fed. Appx. 952, at *4 (11th Cir. May 15, 2008).

First, Isley claims that Hollis's testimony was not needed because Special Agent Erica Wilker had already testified that the charges to the Capital One cards were personal in nature; thus, Hollis was called solely to emphasize Isley's sexual orientation and to introduce evidence of her infidelity. To the contrary, Isley specifically argued during the opening statement that the Capital One credit cards were used for both personal and business expenses. Hollis, also an account holder, was the only person other than Isley who could testify that the indicted transactions were personal in nature. Prior to her testimony, the Government did not know whether Isley planned to dispute the personal nature of the charges. Accordingly, Hollis's testimony was not unnecessary.

Second, the Government properly impeached Hollis under Federal Rule of Evidence 607 by eliciting from her that she may have a bias against Isley because of their break-up. Thus, we find no error in the admission of this evidence. Nevertheless, Isley contends that if the testimony is admissible, its probative value is substantially outweighed by the danger of unfair prejudice. Even if we were to agree with Isley on this point, she is not entitled to a new trial because she has not shown that its admission changed the outcome of the trial. The evidence of Isley's healthcare fraud and honest services mail fraud amply supports the convictions.

25

## 2.    Charitable Donation Evidence

As an initial matter, we will review the admission of the evidence that Isley donated $20,000 to the Atlanta Lesbian Center for an abuse of discretion. United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005). While the Government points out that Isley did not contemporaneously object to the donation evidence when it was admitted, Federal Rule of Evidence 103(a) provides that "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."[24] In this case, the district court definitively ruled prior to trial that the donation evidence would be admissible.

Federal Rule of Evidence 404 prohibits evidence of other bad acts to prove the character of a person in order to show she acted in conformity therewith. This evidence is admissible, however, if it may show proof of "motive, opportunity, intent, preparation, plan . . . or absence of mistake." Fed. R. Evid. 404(b). Evidence of other bad acts is not extrinsic to the charged offense under Rule 404(b), however, "when it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence

---

[24] "When the ruling is definitive, a renewed objection . . . at the time the evidence is to be offered is more a formalism than a necessity." Fed. R. Evid. 103, advisory committee's note to 2000 Amendment.

26

regarding the charged offense." United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (internal quotations and citations omitted).   Here, Isley does not contest that the donation evidence was either inextricably intertwined with the scheme to defraud Orthoscript through the unauthorized use of its funds or offered for a proper purpose under Rule 404(b).  Rather, Isley contends that its probative value was limited and substantially outweighed by its potential for unfair prejudice.  Regardless of whether the donation evidence falls inside or outside the scope of Rule 404(b), the evidence must still satisfy the requirements of Rule 403.[25]  Id.

The donation evidence was not the only evidence of unauthorized personal charges on the corporate American Express card.  The Government also presented evidence that Isley used this credit card to pay for Christmas and birthday parties.  There was also evidence that she took unauthorized salary increases throughout the relevant time period.  All of these unauthorized expenditures occurred during the same time that Isley was paying her Capital One accounts with Orthoscript funds.  It is probative of Isley's intent and plan to defraud her employer and of her motive in defrauding Medicare.  The charitable donation was simply part and parcel of such  evidence.  It was not unfairly singled out or emphasized by the prosecution.

_____

[25]  Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

27

Moreover, the nature of the donation had to be revealed to show that it was personal and unauthorized, i.e., was not related to or did not further the business of Orthoscript.  Finally, any prejudice arising from the fact that the charitable donation was made to the Atlanta Lesbian Center was mitigated by the defense's qualification of the jury to ensure there was no bias against her sexual orientation.

In short, the probative value of the charitable donation evidence was not substantially outweighed by the danger of unfair prejudicial.  See Edouard, 485 F.3d at 1344 n.8 ("Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." (quotation marks, citation, and brackets omitted)).  The district court therefore did not abuse its discretion in its admission of the evidence.

## III.  CONCLUSION

For all of the foregoing reasons, Isley's convictions are **AFFIRMED**.